PEOPLE v MAMON

Docket No. 85519. Argued January 9, 1990 (Calendar No. 2). Decided June 20, 1990.

Mark Mamon was bound over for trial by the 36th District Court on a charge of possession of a controlled substance. After a hearing, the Detroit Recorder's Court, Wendy M. Baxter, J., dismissed the case after suppressing evidence of cocaine on the ground that the police had obtained it as a result of an unlawful seizure of the defendant resulting from their pursuit of him without a reasonable, articulable suspicion upon which to base their actions. The Court of Appeals, SULLIVAN, P.J., and MURPHY and M. WARSHAWSKY, JJ., affirmed (Docket No. 102233). The people appeal.

The Supreme Court *held:*

The pursuit of the defendant by the police was not a seizure under the Fourth Amendment. Evidence of the cocaine found in a bag the defendant discarded during the pursuit should not have been suppressed.

Chief Justice RILEY, joined by Justices BOYLE and GRIFFIN, stated that the police pursuit of the defendant did not constitute a seizure under the Fourth Amendment; the defendant relinquished any reasonable expectation of privacy in the contents of the bag discarded during the pursuit and thus did not have standing to challenge their introduction.

Standing to challenge the introduction of particular evidence under the Fourth Amendment depends upon whether the defendant had a reasonable expectation of privacy in the particular goods at issue. A person does not have a reasonable expectation of privacy in property which has been abandoned. In this case, the police did not need a warrant to search the bag discarded by the defendant during the pursuit because the defendant relinquished any reasonable expectation of privacy in the bag and its contents when he voluntarily discarded it.

The conduct of the police in this case did not constitute a seizure under the Fourth Amendment. The police followed the defendant on foot only after he fled a street corner that had a history of drug transactions. Further, the police never exhibited any show of authority which would have indicated to a reason-

able person a lack of freedom to leave. Without more, a police foot chase does not amount to a seizure within the meaning of the Fourth Amendment.

Justice BRICKLEY, concurring in the result, stated that factors which bear on the characterization of an automotive chase of a pedestrian should not be transferred automatically to the context of a foot chase. It is the communication by police of an intent to detain, combined with the ability to detain, that forms the basis of a seizure within the meaning of the Fourth Amendment. In this case, it cannot be concluded that the actions of the police amounted to a seizure. From the perspective of a reasonable person, the defendant could not have perceived an attempt by the officer to capture him or otherwise interfere with his freedom of movement. Because no seizure was proven to have occurred at the moment the defendant discarded the bag, its contents could not be suppressed as the fruit of any illegal detention.

Reversed and remanded.

Justice ARCHER, joined by Justice CAVANAGH, dissenting, stated that under the circumstances of the case, the trial court appropriately granted the defendant's motion to quash. In accordance with *People v Shabaz,* 424 Mich 42 (1985), the aggressive pursuit of the defendant by the police demonstrated an unjustified act that impermissibly interfered with his Fourth Amendment right to be free from unreasonable seizures.

Justice LEVIN, in a separate opinion, stated that the record in this case would support a finding that the presence of a uniformed police officer who emerged from a marked police vehicle and started to run after the defendant communicated a show of police authority and an intent to capture or detain the defendant. A reasonable person would not have felt free to disregard the police presence and go about business. Because the Fourth Amendment search and seizure issue was not addressed in a separate hearing focusing on the question whether the evidence seized should be suppressed, and because *Michigan v Chesternut,* 486 US 567 (1988), which addressed this issue, was decided after the information was dismissed by the Detroit Recorder's Court and before the dismissal was affirmed by the Court of Appeals, the most appropriate course of action would be to remand the case to the Court of Appeals with the direction that it be remanded by that Court to the Detroit Recorder's Court for the making of a record in light of *Chesternut.*

173 Mich App 429; 435 NW2d 12 (1988) reversed.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Criminal Division, Research, Training and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

*Cornelius Pitts* and *Elaine Carlis* for the defendant.

RILEY, C.J. This case presents us with the issue whether the Fourth Amendment of the United States Constitution and Michigan's analogous provision, Const 1963, art 1, § 11,[1] apply to a defendant who discards illegal contraband during a police chase. Our determination of this issue depends upon the resolution of two narrower issues: First, whether a person has standing in the context of the Fourth Amendment to challenge the introduction of a discarded bag containing illegal drugs, or, more specifically, whether the person has a reasonable expectation of privacy in the discarded bag and its contents, and, second, whether police pursuit of a person amounts to a seizure under the Fourth Amendment of the United States Constitution.

Under the facts of the instant case, we would hold that the defendant did not have standing to

---

[1] The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation.

We have not previously interpreted this provision differently from the Fourth Amendment of the United States Constitution. *People v Shabaz,* 424 Mich 42; 378 NW2d 451 (1985); *People v Moore,* 391 Mich 426; 216 NW2d 770 (1974); *People v Pennington,* 383 Mich 611; 178 NW2d 471 (1970). Therefore, any reference to the Fourth Amendment applies equally as well to Const 1963, art 1, § 11. See *Michigan v Long,* 463 US 1032; 103 S Ct 3469; 77 L Ed 2d 1201 (1983).

challenge the introduction of the narcotics discov-
ered in the bag. Rather, we believe that the defen-
dant renounced any reasonable expectation of pri-
vacy in the bag and its contents once he aban-
doned it during the police chase. We also would
hold that the police pursuit of the defendant did
not constitute a seizure under the Fourth Amend-
ment. Consequently, the police conduct never im-
plicated the constitutional protections provided by
the Fourth Amendment. We would reverse the
decisions of the Court of Appeals and the trial
court and remand this case to the trial court for
proceedings consistent with this opinion.[2]

### I. FACTS AND PROCEEDINGS

The defendant was charged with possession of a
controlled substance, MCL 333.7403(2)(a)(iv); MSA
14.15(7403)(2)(a)(iv). Kelvin Patrick, a Detroit po-
lice officer, offered the only testimony at the pre-
liminary examination. He testified that on Septem-
ber 19, 1986, at approximately 7:50 P.M., he and
his partner were driving a marked patrol car
southbound on Log Cabin in Detroit. As they
approached the corner of Log Cabin and Grove, an
area with a history of narcotics activity, they
observed the defendant, Mark Mamon, standing

---

[2] The defendant also contends, and the Court of Appeals agreed,
that the police did not have a reasonable, articulable suspicion
justifying the seizure. See Shabaz, n 1 supra; People v Terrell, 77
Mich App 676; 259 NW2d 187 (1977). However, we need not address
this issue because we conclude that the police had not seized the
defendant when he abandoned the narcotics.

We also note that in Michigan v Chesternut, 486 US 567, 575, n 8;
108 S Ct 1975; 100 L Ed 2d 565 (1988), in dicta, the United States
Supreme Court distinguished, rather than overruled Shabaz, on the
grounds that the prosecutor in Shabaz stipulated that the chase
constituted a seizure. Our review of the briefs in Shabaz indicates
that the prosecutor vigorously argued that the chase did not consti-
tute a seizure. Apparently, the Shabaz Court assumed, without decid-
ing, for purposes of this opinion that the police chase constituted a
seizure.

next to a public telephone. The defendant noticed the police car and fled toward a dwelling located at 16744 Log Cabin. The officers stopped the car and followed the defendant on foot, during which time they saw the defendant reach into his right pocket and throw away a burgundy-colored bag. The officers detained the defendant and retrieved the bag, in which they discovered six particles of suspected cocaine.[3]

Upon the basis of this information, the district court bound the defendant over to Detroit Recorder's Court on the controlled substance charge. At a hearing on May 29, 1987, the Recorder's Court suppressed the cocaine and dismissed the case upon the basis of *People v Shabaz,* 424 Mich 42; 378 NW2d 451 (1985). The court reasoned that the police obtained the cocaine as a result of an unlawful seizure. In particular, the court found that the police pursuit constituted a seizure and that, at the time the police initiated their pursuit of the defendant, they did not have a reasonable, articulable suspicion upon which they could base their actions. The Court of Appeals affirmed the decision of the trial court.[4] On June 30, 1989, this Court granted the people's application for leave to appeal.[5]

## II. ANALYSIS

The Fourth Amendment provides in pertinent part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." US Const, Am IV. In order to

---

[3] Subsequent chemical tests confirmed that the bag contained cocaine.

[4] 173 Mich App 429; 435 NW2d 12 (1988).

[5] 432 Mich 921 (1989).

receive the panoply of its constitutional safe-guards, a person must have standing in the context of the Fourth Amendment to challenge the introduction of the particular piece of evidence being offered against him. This initial standing inquiry depends upon whether the defendant has a reasonable expectation of privacy in the particular goods at issue. *Katz v United States,* 389 US 347, 361; 88 S Ct 507; 19 L Ed 2d 576 (1967) (Harlan, J., concurring); *Terry v Ohio,* 392 US 1, 9; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Moreover, a person does not have a reasonable expectation of privacy in property which he has "abandoned." *Abel v United States,* 362 US 217, 241; 80 S Ct 683; 4 L Ed 2d 668 (1960); *Hester v United States,* 265 US 57, 58; 44 S Ct 445; 68 L Ed 898 (1924); *People v Jackson,* 175 Mich App 562; 438 NW2d 84 (1988); *People v Wright,* 151 Mich App 354; 390 NW2d 187 (1986); *People v Boykin,* 119 Mich App 763; 327 NW2d 351 (1982); *United States v Thomas,* 275 US App DC 21, 23-24; 864 F2d 843 (1989). As the United States Court of Appeals for the District of Columbia recently explained:

> A warrantless search or seizure of property that has been "abandoned" does not violate the fourth amendment. See, e.g., *Abel v United States,* 362 US 217, 241; 80 S Ct 683, 698; 4 L Ed 2d 668 (1960). "When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had." *United States v Jones,* 707 F2d 1169, 1172 (CA 10 [1983]) (citation omitted), cert den 464 US 859; 104 S Ct 184; 78 L Ed 2d 163 (1983). The test for abandonment in the search and seizure context is distinct from the property law notion of abandonment: it is possible for a person to retain a property interest in an item, but nonetheless to relinquish his or her reasonable expectation of privacy in the object. See, e.g., *United States v Colbert,* 474 F2d 174, 176

(CA 5, 1973). To determine whether there is aban-
donment in the fourth amendment sense, the dis-
trict court must focus on the intent of the person
who is alleged to have abandoned the place or
object. See *United States v Anderson,* 663 F2d 934,
938 (CA 9, 1981). The test is an objective one, and
intent may be inferred from "words spoken, acts
done, and other objective facts." *Colbert,* 474 F2d
at 176.

Accordingly, in the instant case, we must deter-
mine whether the defendant had a reasonable
expectation of privacy in the bag and its contents.
If he did, then the search of the bag without a
warrant violated the defendant's Fourth Amend-
ment rights. Whereas, if he did not, as the people
contend, when the defendant threw away the bag,
he abandoned it and cut off his standing to chal-
lenge the introduction of the bag and its contents
under the Fourth Amendment.

The people argue, and we agree, that the police
did not need a warrant to search the discarded
bag. Our assessment of the facts persuades us that
the defendant unquestionably relinquished any
reasonable expectation of privacy in the bag and
its contents when he voluntarily reached into his
right pocket and discarded the bag.[6]

However, the defendant contends that even if he

---

[6] Many courts consider the determination of whether a person has
abandoned property as a factual inquiry into the person's intent, and
therefore, reviewable under a "clearly erroneous" standard of review.
See *Wright, supra; Thomas, supra* at 846. See also *People v Burrell,*
417 Mich 439, 448; 339 NW2d 403 (1983) (the trial court decision at
the suppression hearing was reviewed under a clearly erroneous
standard). In the instant case, neither the trial court nor the Court of
Appeals addressed this issue. However, we note that the defendant
appears to concede the issue. More importantly, from our review of
the record, we can find no testimony which would lead to the conclu-
sion that the defendant did not intentionally relinquish any expecta-
tion of privacy in the cocaine when he threw away the bag in which it
was contained. Thus, unlike *Shabaz,* there is no evidence which might
lead to the conclusion that the defendant attempted to conceal, rather
than abandon, the bag. 424 Mich 65-66.

abandoned the bag, he did so contemporaneously with or after the police unlawfully seized him. Therefore, he contends that the trial court properly suppressed the narcotics found in the bag as evidence obtained solely from an unlawful seizure. *Wong Sun v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963). We will only reverse the decision of the trial court if it clearly erred at the suppression hearing. *People v Burrell,* 417 Mich 439, 448; 339 NW2d 403 (1983). Consequently, we must determine whether the police conduct constituted a seizure under the Fourth Amendment.

In a recent case almost identical to the one before this Court today, the United States Supreme Court refused to adopt a brightline rule to determine when a police chase constituted a seizure. *Michigan v Chesternut,* 486 US 567, 573; 108 S Ct 1975; 100 L Ed 2d 565 (1988).[7] Rather, the Court reaffirmed its adherence to a "traditional contextual approach":

> In *Terry v Ohio,* 392 US 1 (1968), the Court noted:
> "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19, n 16. . . .
> The test provides that the police can be said to have seized an individual "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." . . .
> The test is necessarily imprecise, because it is designed to assess the coercive effect of police

---

[7] The *Chesternut* Court rejected the defendant's proposed brightline rule that all police chases are seizures. The Court also rejected the prosecutor's proposed brightline rule that a seizure never occurs until the suspect responds to the police officer's show of authority.

conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs. [Citations omitted.]

In *Chesternut,* two police officers, while on routine patrol in a marked police car, approached an intersection in a high crime area of Detroit when they noticed the defendant standing at the street corner talking with another man. The defendant ran upon seeing the police car. The police followed the defendant in their car "to see where he was going." *Id.,* p 569. They caught up with him and drove alongside the defendant for a short distance. At this point, the police observed the defendant throw away a number of tiny packets. One officer got out of the car and examined the packets. The packets contained pills which the officer suspected contained codeine. The police arrested the defendant for possession of narcotics. A search of the defendant at the police station revealed more pills, heroin, and a hypodermic needle. Under these facts, the Supreme Court concluded

that respondent was not seized by the police before he discarded the packets containing the controlled substance. Although Officer Peltier referred to the police conduct as a "chase," and the Magistrate who originally dismissed the complaint was impressed by this description, the characterization is not enough, standing alone, to implicate Fourth Amendment protections. Contrary to respondent's assertion that a chase necessarily communicates that detention is intended and imminent . . . the police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon respondent's

freedom of movement. The record does not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement. . . . While the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure. Cf. *United States v Knotts,* 460 US 276 [103 S Ct 1081; 75 L Ed 2d 55] (1983) (holding that continuous surveillance on public thoroughfares by visual observation and electronic "beeper" does not constitute seizure); *Florida v Royer,* 460 US [491, 497; 103 S Ct 1319; 75 L Ed 2d 229 (1983)] (plurality opinion) (noting that mere approach by law enforcement officers, identified as such, does not constitute seizure). Without more, the police conduct here—a brief acceleration to catch up with respondent, followed by a short drive alongside him—was not "so intimidating" that respondent could reasonably have believed that he was not free to disregard the police presence and go about his business. [*Immigration & Naturalization Service*] *v Delgado,* 466 US [210, 216; 104 S Ct 1758; 80 L Ed 2d 247 (1984)]. The police therefore were not required to have "a particularized and objective basis for suspecting [respondent] of criminal activity," in order to pursue him. *United States v Cortez,* 449 US 411, 417-418 [101 S Ct 690, 694-695; 66 L Ed 2d 621] (1981). [*Chesternut, supra,* pp 574-576.]

The defendant contends that *Chesternut* is distinguishable from the instant case. More precisely, he argues this Court should distinguish the instant case from *Chesternut* because the police in *Chesternut* "drove alongside" rather than pursued the defendant on foot.[8] We disagree.

---

[8] Apparently, the defendant also believes that we should distinguish

The police in *Chesternut* "drove alongside" the defendant only after they accelerated their marked police car in an obvious attempt to catch up with him. Furthermore, they did so after the defendant fled from a street corner with a history of narcotics activity and without any provocation from the police. Although the Court recognized that this type of police conduct might be somewhat intimidating, it would not necessarily convey to a reasonable person that he was not free to leave. Similarly, in the instant case, the police followed the defendant on foot only after he fled a street corner with a history of drug transactions. As in *Chesternut,* while following a person on foot might be somewhat "intimidating," it does not amount to a seizure under the Fourth Amendment. We do not believe that it would convey to a reasonable person that he was not free to leave. Conversely, it cannot be assumed that a person's unprovoked flight from a street corner in a high crime area is an indication of that person's desire to avoid communication with the police. Moreover, we see no distinguishable difference between accelerating in a police car to catch up with a fleeing person and doing so on foot. In either case, without more, the police have not seized the person.

We also believe that application of the other factors considered integral by the *Chesternut* Court in determining whether a seizure occurred supports our conclusion in the instant case. As the *Chesternut* Court noted,

> [T]he police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon

---

between police "chases," "pursuits," and "followings." We decline to do so. In our opinion, these terms have similar, if not the same, meanings in the context of these cases.

respondent's freedom of movement. The record does not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement. [*Chesternut, supra,* p 575.]

Similarly, in the instant case, the police never acted in a manner which might transform a police chase into a Fourth Amendment seizure. They never activated a siren or flasher, they never commanded the defendant to halt, they never displayed any weapons, and they never attempted to force the defendant to run in a direction other than the one chosen by him when he decided to flee from the street corner.[9] See *People v Hamp,* 170 Mich App 24; 428 NW2d 16 (1988). (The police seized the defendant when he entered a home. The police surrounded the defendant and began reaching for their badges.) Put simply, the police never exhibited any show of authority which would indicate to a reasonable person that he was not free to leave.[10]

To conclude otherwise, in the context we are presented with today, would effectively do what the United States Supreme Court has specifically refused to do: reduce the totality of the circum-

[9] While we agree with the dissent that the *Chesternut* Court never intended this list of other factors to be exhaustive, without the existence of these or any "additional" factors in the instant case, the police pursuit did not constitute a seizure.

[10] In *Immigration & Naturalization Service v Delgado, supra* at 218, the Court noted that immigration agents posted at the exits of a factory did not amount to a seizure of the factory worker because the agents did nothing that would lead the defendants to believe they were not free to leave. Analogously, in the instant case, the defendant ran from the street corner *before* the police chased after him. We find this significant because it shows that it was not the police conduct that coerced the defendant into fleeing, but rather the defendant's belief that he was free to leave the street corner.

stances test to a brightline rule in which almost every police chase constitutes a seizure. For example, consider the Court of Appeals suggestion that the police can do more than "stand idly by and watch defendant run. Rather, defendant's activity was suspicious enough to justify some further investigation." 173 Mich App 429, 442-443; 435 NW2d 12 (1988). We think the Court of Appeals correctly recognized that the police can do more than stand by idly and observe the defendant run away. However, under the Court of Appeals analysis, once the police officers observe a person running, they cannot follow after him without "seizing" him for purposes of the Fourth Amendment. Surely the Court of Appeals and defendant do not suggest that the police may only walk after a person who is running away. In essence, the Court of Appeals and the defendant imply that the police can only pursue a defendant under the narrow factual circumstances of *Chesternut.* We do not read the United States Supreme Court opinions as limiting nonseizure police chases to these rare situations.

We find it incomprehensible that the police can drive up to and alongside a person fleeing in the opposite direction, but once they get out of the car and commence their pursuit on foot, the pursuit instantaneously transforms into a seizure. Nothing in *Chesternut* even remotely suggests this conclusion. In our opinion, without more, a police foot chase does not amount to a seizure within the meaning of the Fourth Amendment. Otherwise, we would effectively reduce the role of a police officer to that of a mere spectator. Effective law enforcement techniques not only require passive police observation, but also necessitate their interaction with citizens on the streets. This interaction means that oftentimes the police must follow after

and observe persons moving faster than a person walking at a normal pace.

We recognize that there is a delicate balance between efficient police conduct which does not intrude upon a person's constitutional rights, and that which does. However, we cannot ignore the devastating effect that illegal drugs has had on our society. Our decision today permits police to participate actively and effectively to help curtail the use of illegal drugs, while not intruding upon a person's Fourth Amendment right against unreasonable seizures. On the one hand, it permits the police to follow and observe persons in public places, and on the other, it leaves open the possibility that some police chases might constitute a seizure under the Fourth Amendment. As the *Chesternut* Court noted, the inquiry is whether a "reasonable person" thought he was free to leave and not whether the defendant thought he was free to leave. A reasonable person would not necessarily believe that police following after him intended to capture him, nor would his unprovoked flight from a street corner necessarily express his preference not to communicate with the police.

Moreover, we believe that *Brower v Inyo Co,* 489 US 593; 109 S Ct 1378; 103 L Ed 2d 628 (1989), a recent civil rights case decided by the United States Supreme Court, supports our conclusion. In *Brower,* the police set up a roadblock in order to stop a car thief. The thief crashed into the roadblock and died. The thief's estate brought a civil rights action against the police. Significantly, the majority stated in dicta that

> [v]iolation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking

[citations omitted], but the detention or taking itself must be willful. . . .

. . . It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent pass-erby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.* [*Id.,* pp 596-597. Emphasis in original.]

Although not necessary to our decision in the instant case because of our reliance upon *Chesternut,* the *Brower* dicta strongly suggest that the police conduct in the instant case did not constitute a seizure within the meaning of the Fourth Amendment.

### III. CONCLUSION

Therefore, we conclude that the police pursuit of the defendant did not amount to a seizure under the Fourth Amendment. Consequently, the defendant relinquished any reasonable expectation of privacy in the contents of the bag once he discarded it during his flight from the street corner. He had no standing to challenge its admissibility under the Fourth Amendment. We would reverse the opinion of the Court of Appeals and remand the case to the trial court for proceedings consistent with this opinion.

BOYLE and GRIFFIN, JJ., concurred with RILEY, C.J.

BRICKLEY, J. (*concurring*). I agree with the result

reached in the lead opinion,[1] but, because I believe a distinction must be drawn between automotive pursuits of pedestrians and those undertaken on foot, I am compelled to write separately.

In *Michigan v Chesternut,* 486 US 567, 573, 575; 108 S Ct 1975; 100 L Ed 2d 565 (1988), the United States Supreme Court held that police pursuit of the defendant did not implicate the Fourth Amendment where the police followed the pedestrian defendant in a squad car and did not "attempt to capture or otherwise intrude upon respondent's freedom of movement." The Court identified factors which, if present, might have given rise to a contrary conclusion in that case—the use of sirens or flashers, a command to halt, a display of weapons, or an attempt to block the defendant's path or otherwise affect the speed or direction of defendant's movement. *Chesternut* explicitly declined the invitation to hold that "the Fourth Amendment is never implicated until an individual stops in response to the police's show of authority." *Id.,* p 572. Rather, the totality of the circumstances presented in an individual case must be examined in order to determine whether a pursuit rises to the level of a Fourth Amendment "seizure." *Id.*

I agree that the police actions in this case did not amount to a seizure implicating the protection of the Fourth Amendment. In my judgment, however, the factors which bear on the characterization of an automotive chase of a pedestrian should not be transferred automatically to the context of a foot chase. The lead opinion apparently sees no difference between these two scenarios. Applying the *Chesternut* factors to this case, the lead opinion finds the factors missing and holds that *no*

---

[1] References to the "lead opinion" are to the opinion of Chief Justice RILEY.

seizure occurred. While *Chesternut* is clearly relevant here, the lead opinion does not distinguish *People v Shabaz,* 424 Mich 42; 378 NW2d 451 (1985), in which we recently held that a pedestrian who was chased by police, first by car and then by foot, was seized for Fourth Amendment purposes. Because we are required to take into account the totality of the circumstances presented in the case before us, *Chesternut, supra,* p 572, and because *Shabaz* is factually closer to the instant case than is *Chesternut,* I find this omission troubling. The facts of *Shabaz* are as follows:

> The vehicle was proceeding westbound on Clairmount from Woodward when Officer Surma observed defendant leaving a building at 60 Clairmount, which is on the north side of Clairmount and which comprises approximately thirty apartments.
>
> Surma observed defendant carrying a small brown paper bag, and walking east on Clairmount toward Woodward Avenue. At the time he observed defendant leaving the building, Surma was in the police vehicle approximately fifty feet from the defendant, and the police car was moving toward defendant. Defendant looked in Surma's direction and began "stuffing a paper bag like under his vest," or "in his pants." The driver, Officer Scotsky, slowed the vehicle, and the defendant and the scout car passed each other. When the officers' vehicle had nearly come to a complete stop, defendant "took off running." Surma testified: "We started slowing down to take a better look at what he was doing. As we were coming to a stop, he immediately started to run."
>
> Officer Scotsky put the car in reverse and backed the vehicle to the corner of Woodward and Clairmount. When the car was approximately ten to fifteen feet from defendant, Surma got out of the car and chased the defendant south on Woodward while Officer Hayes "backed up" Surma.

Surma chased defendant a distance of about three storefronts, and observed defendant enter a doorway at 9037 Woodward. During the chase, Surma did not observe anything in defendant's hands. By the time Surma reached the doorway the defendant had entered, defendant was coming out. Surma grabbed defendant and, as the defendant tried to push away, Surma "tossed him towards Officer Hayes," and Hayes subdued the defendant. While chasing the defendant, Hayes had pulled his service revolver and, when defendant and Hayes collided, the firearm discharged, although no one was struck. Surma then went into the vestibule of the building and retrieved a closed, brown paper bag. Surma did not know what was in the bag until after he retrieved it. The bag contained a "Smith & Wesson, four inch blue steel revolver, .357." [*Shabaz, supra,* pp 46-48.]

Although we held that Shabaz' flight from the unmarked squad car did not furnish sufficient suspicion for a stop, our opinion did not state that the "stop" occurred at the time Shabaz began to run. In my opinion, Shabaz was not seized until the police, after shifting the car into reverse to follow Shabaz, got out of the vehicle ten to fifteen feet from Shabaz and ran after him. Such behavior, in my judgment, communicates "to the reasonable person an attempt to capture . . . ." *Chesternut, supra,* p 575. Officers in a squad car who do not manifest an intention to restrict a pedestrian's movement may be intimidating to a pedestrian, but, absent efforts to restrict the pedestrian's movement with the police car, they do not communicate an immediate ability to effectuate a stop. By contrast, a constable jumping out of a car to give chase on foot just a few feet behind a pedestrian can, even absent a command to halt, convey to a reasonable person not only an intent to detain, but also that detention is imminent. It is the combina-

tion of these factors—a communicated intent and ability to detain—which, in my opinion, forms the basis of our finding in *Shabaz* that the defendant was seized within the meaning of the Fourth Amendment.[2]

The question before us now is whether this case is distinguishable from *Shabaz* on the issue whether the defendant was "seized." While I agree with the lead opinion that the ruling of the trial court should not be disturbed absent clear error, it is my judgment that the defendant has not brought out facts to show that the combination of the officers' communicated intent 'and ability to "seize" the defendant would have caused the defendant, from the viewpoint of a reasonable person, to believe "that he was not free to leave," *Chesternut, supra,* p 573, quoting *United States v Mendenhall,* 446 US 544, 554; 100 S Ct 1870; 64 L Ed 2d 497 (1980), or to perceive an attempt to capture or other interference with his freedom of movement. *Chesternut, supra,* p 575.[3]

According to the preliminary examination testi-

---

[2] This situation can be contrasted with those in which either of the two factors mentioned above is missing. No seizure would be present where an officer manifests an intention to detain where detention cannot be accomplished. For example, in my opinion, it would border on the absurd to suggest that a police officer who yells "halt!" out of a fourth floor window at someone on the street who mounts a motorcycle and speeds away into traffic has "seized" the driver. Conversely, it is obvious that no seizure would be present where an officer merely has the ability to detain a citizen but displays no intent to do so. (These examples assume, of course, that no actual, physical detention has been accomplished.)

[3] In my view, the burden of proof was on the defendant to show by a preponderance of the evidence that a "seizure" occurred. See generally 4 LaFave, Search & Seizure (2d ed), §§ 11.2(b), 11.2(c). In addition, I believe that *Chesternut* did not articulate a new legal standard, but rather applied the familiar *Mendenhall* standard in the context of a police chase. For this reason, I disagree with Justice LEVIN that the defendant is entitled to a second bite at the seizure issue. The defendant had both notice and an opportunity to demonstrate that, under the totality of the circumstances, he could reasonably have believed that he was not free to leave.

mony of Officer Patrick,[4] the defendant, unlike Shabaz, started to run *before* there had been any indication that he was being pursued. Thus, at the moment the defendant started to run, he was not seized. Thereafter, the police stopped the car, and Officer Patrick got out and began to run after the defendant. Eventually, Officer Patrick caught up with the defendant. It is clear that at this point, the "seizure" of the defendant had been accomplished. Between the time the defendant started to run and the time he was physically captured by the police, two significant events occurred: the defendant was "seized" under *Chesternut,* and the defendant discarded the drugs. It is not clear from the record, however, whether the defendant was seized *before* he discarded the bag. The record does not indicate (1) how long it took for the police car to pull over and for Officer Patrick to get out of the car, (2) how far away Officer Patrick was when he began to chase the defendant, (3) how far away Officer Patrick was when the defendant discarded the bag of drugs, or (4) whether there were other persons or activities present in the area. All these factors bear on the ultimate question—whether the defendant, from the perspective of a reasonable person, would have perceived an attempt to capture him or other interference with his freedom of movement.

From the scant record before us, I am reluctant to conclude that the defendant was seized the moment Officer Patrick left his car. There is nothing before us to suggest that the defendant, who was sprinting *away from* the police car, could reasonably perceive (1) that Officer Patrick had

[4] Officer Patrick's testimony is the only evidence in the record before us. He was the only witness at the preliminary examination, and the defendant waived the production of additional witnesses at the subsequent hearing.

left his car, and (2) that Officer Patrick was chasing *him* rather than responding to something else the officers had seen. Since it is possible that the defendant tossed the bag aside very shortly after he began running, and since it is not clear just what actions of the officer were made known to him before he discarded the bag, I conclude that, on the record before us, defendant has not established that he was "seized" when he jettisoned the pouch.

No Fourth Amendment seizure having been proven to have occurred at that moment, the contents of the bag are not suppressible as the fruit of any illegal detention of the defendant. The defendant does not—and on these facts could not—argue that the officers' retrieval of the pouch flowed from any allegedly illegal police activity other than the pursuit by Officer Patrick preceding the defendant's act of discarding the drugs. Because this pursuit did not, in my opinion, constitute a "seizure," I find it unnecessary to reach the standing issue first discussed in the lead opinion.[5]

For these reasons, I concur in the result of the lead opinion.

ARCHER, J. (*dissenting*).

I

We granted leave to appeal to determine whether the trial court erred in quashing the information and in dismissing this case. The majority believes the trial court did so err and, as a result, would reverse the decision of the Court of Appeals and remand the instant case to the trial

---

[5] We discussed the standing issue in *Shabaz* only because we found that the defendant in that case had been "seized" before he parted with the evidence whose suppression was at issue.

court. I write separately to express my disagree-
ment.

## II

### A

The defendant in this case filed a motion to
quash the information, or in the alternative to
suppress the evidence, and for an evidentiary hear-
ing. The motion to quash was based on defendant's
argument that *he* was unlawfully seized. In con-
trast, the alternative motion to suppress concerned
only the seizure of cocaine rocks allegedly dropped
by the defendant. The trial court granted defen-
dant's motion to quash and ordered dismissal of
the case, stating, "I'm convinced that *Shabazz* [sic]
is controlling and, accordingly, your motion is
granted." In light of this ruling, the issue whether
the evidence should have been suppressed was
never raised or reached. Hence, the motion to
suppress has not been litigated and is not at issue
for this Court's consideration.

The principal duty of this Court in this case is to
determine whether the trial court erred in grant-
ing defendant's motion to quash. The standard of
review for motions to quash was stated by this
Court in *People v Medley,* 339 Mich 486, 492; 64
NW2d 708 (1954), as follows:

> Does the evidence justify, as a matter of law, the
> holding of the trial judge that the examining
> magistrate was guilty of an abuse of discretion?[1]

In determining whether the trial court has com-

---

[1] In other words, a trial court grant of a defendant's motion to
quash the information is, in effect, a determination that there was an
abuse of discretion by the magistrate in binding the defendant over
for trial.

mitted error, this Court must determine whether that court properly granted the motion to quash on the basis of a sound and appropriate belief that there was an abuse of discretion by the magistrate, or whether the trial court merely substituted its judgment for that of the magistrate. See *People v Talley,* 410 Mich 378; 301 NW2d 809 (1981).

The question whether there has been an abuse of discretion by the magistrate is governed by *People v Charles O Williams,* 386 Mich 565, 572; 194 NW2d 337 (1972), wherein this Court held:

> "In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." [Quoting *Spalding v Spalding,* 355 Mich 382, 384-385; 94 NW2d 810 (1959).]

**B**

The evidence in this case justifies, as a matter of law, the trial judge's decision to quash the information, and hence, that the magistrate abused his discretion. The trial court decision resulted from the court's direct application of the existing legal standard governing this issue found in *People v Shabaz,* 424 Mich 42; 378 NW2d 451 (1985).

In *Shabaz,* this Court held that a defendant's presence in a high crime neighborhood, although a valid consideration in assessing reasonable suspicion, would not establish grounds for an investigative stop. Further, this Court opined that the police officer's observation of the defendant concealing a bag in his jacket did not amount to a particularized suspicion of possessory wrongdoing, only a generalized one. Finally, this Court held

that the defendant's flight at the approach of the police, did not, by itself, in the circumstances of that case, support a reasonable suspicion. "Although it is uncontroverted that flight may be a factor to be considered in ascertaining whether there is reasonable suspicion to warrant a *Terry*[2] stop, . . . flight alone is not a reliable indicator of guilt without other circumstances to make its import less ambiguous." *Id.* at 62. Further,

> [c]ertainly it is reasonable to conclude that the defendant's flight away from the vehicle carrying the police officers might reasonably have heightened the officer's general suspicion that the defendant must have had something to hide and wished to avoid contact with the occupants of the vehicle. But heightened general suspicion occasioned by the flight of a surveillance subject does not alone supply the particularized, reasoned, articulable basis to conclude that criminal activity was afoot that is required to justify the temporary seizure approved in *Terry* [*v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968)]. [*Id.* at 62-63.]

Contrary to the assertion of the majority, that the *Shabaz* Court "assumed, without deciding . . . that the police chase constituted a seizure," the *Shabaz* Court stated:

> The officers did not approach Shabaz merely for the purpose of questioning him, after first identifying themselves as police officers, nor was the defendant free to "go on his way." . . . The prosecutor concedes as much, acknowledging in his brief and in oral argument, that the police-citizen encounter in this case was an "investigatory pursuit and stop" . . . . [*Id.* at 58-59.]

---

2 *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

> [T]he pursuit itself by the officers was effectively
> the seizure of the defendant. . . . As soon as the
> officers began their pursuit, defendant's freedom
> was restricted. If he stopped running, he would not
> be free to leave. Events proved that. [Id. at 66.
> Emphasis added.]

In the present case, the magistrate stated the
following:

> Well, as I interpret the testimony, the defendant
> had a perfect right to be on that corner. He wasn't
> using the phone or anything else. He had a perfect
> right to leave if he wanted. But I am not aware of
> anything in the law that would prevent the officer
> from getting out of his car and leaving in the same
> direction if the defendant was leaving at a high
> rate of speed and the officer also left at a high rate
> of speed. Still nothing wrong with it. [Emphasis
> added.]

In my view, however, this Court's decision in
Shabaz points to several things that were wrong
with it. First, a citizen's mere presence in a high
crime neighborhood, such as the Log Cabin and
Grove area, coupled with that citizen's flight at the
sight of the police, does not amount to the "partic-
ularized, reasoned, [and] articulable" suspicion
necessary to justify a temporary seizure. Second,
police pursuit in Michigan can constitute an effec-
tive seizure under the Fourth Amendment.

The facts in this case were nearly identical to
those in Shabaz. Furthermore, Shabaz unquestion-
ably represents the present state of the law in

Michigan.[3] Therefore, I would hold that the magistrate's decision to bind the defendant over in light of *Shabaz* was "not the exercise of judgment but the defiance thereof, not the exercise of reason but rather of passion or bias," see *Williams, supra* at 572, and was hence, an abuse of discretion.[4]

III

The issues before the lower courts in this case were, in light of this Court's ruling in *Shabaz,* whether under the Fourth Amendment of the United States Constitution a seizure occurred and, if so, whether the seizure was lawful. The constitutional concepts applicable in resolving these issues are twofold. The first involves a police officer's ability and authority to approach any citizen on the street and pose questions about any observed behavior without implicating, whatsoever, the Fourth Amendment. The second concerns exactly when and at what point an officer's intrusion becomes a detainment, hence rising to the level of Fourth Amendment infringement.

The United States Supreme Court in *United States v Mendenhall,* 446 US 544, 554; 100 S Ct

[3] *Shabaz* was not rejected, modified, or questioned by the United States Supreme Court in *Michigan v Chesternut,* 486 US 567; 108 S Ct 1975; 100 L Ed 2d 565 (1988). In that case, the Supreme Court specifically stated, "We, of course, intimate no view as to the federal constitutional correctness of . . . [*Shabaz*]." *Id.* at 575, n 8. Further, *Chesternut* affirmed the "case-by-case" approach to determinations of whether seizures have occurred, stating, "[r]ather than adopting either rule proposed by the parties, . . . we adhere to our traditional *contextual* approach, and determine only that, *in this particular case,* the police conduct in question did not amount to a seizure." *Id.* at 572-573. (Emphasis added.)

[4] The trial court decision here also was not a "substitution of its judgment." The facts here were undisputed. Hence, the only task before both the magistrate and the trial court in this case was the application of the legal standard to the facts. Accordingly, it is my opinion that the trial court, rather than substituting its judgment, rectified the magistrate's discretionary error.

1870; 64 L Ed 2d 497 (1980), attempted to objectively answer this question when it wrote, "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Further, the Court in *Terry, supra* reasoned, "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Finally, "[o]nly when the officer, by means of physical force *or* show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19, n 16. (Emphasis added.)

In this case, Officer Patrick did not *physically* restrain Mr. Mamon while chasing after him. Thus, the inquiry is whether Officer Patrick's actions amounted to "a show of authority," which, in turn, restrained the defendant's freedom to walk away. To this end, the United States Supreme Court in *Chesternut, supra,* included police-activated sirens or flashers, verbal commands of halt, or the display of a weapon, as examples of how police officers may communicate an intent to capture, and hence seize, a fleeing citizen. I do not believe the Court intended this list to be exhaustive, however. In my view, the presence of a uniformed police officer emerging from a marked police vehicle into an unrestrained, full sprint in pursuit of a citizen, communicates two things: a show of police authority and an intent to capture or detain the person.

Although I agree that Officer Patrick should not have been required, under the Fourth Amendment, to do nothing and simply watch as Mamon took flight and disappeared, my concern involves the question exactly what actions are constitution-

ally permissible. For example, the police officer in *Chesternut* did not, as in the case at bar, immediately charge after the fleeing defendant. Instead, the officers chose to heighten their observation of the defendant, trailing quietly, while remaining inside the police vehicle, and, hence, displaying no objective intent to capture. Against this factual backdrop, the Supreme Court held that the officer's cautious decision "to see where [the defendant] was going," *id.* at 569, could not have communicated to the fleeing defendant that he was not free to ignore the police and leave. Indeed, the officer in *Chesternut* did not get out of the police vehicle or in any way demonstrate a desire to capture or detain until the defendant discarded what the officer suspected to be packets of controlled substances. At that point, not only did the officer have a "particularized, reasoned, [and] articulable" suspicion, but also probable cause for arrest.

In the case at bar, Officer Patrick, likewise, would not have crossed the line intruding upon Mamon's Fourth Amendment rights had he chosen merely to trail Mamon "to see where he was going."[5] Such observation, even at close range, is not intrusive enough to unequivocally communicate a desire to detain or capture. Clearly, Officer Patrick's decision to emerge from a marked police vehicle in uniform, for the purpose of aggressively chasing after Mamon, communicated more than

---

[5] By this, I do not intend to imply, as intimated by the majority, that the actions of the police in *Chesternut* represent the *only* permissible actions that can be taken in response to a fleeing citizen. However, I do believe the facts in *Chesternut* are illustrative of passive yet effective surveillance which does not unduly intrude upon the Fourth Amendment. Thus, I venture to say that with the passage of time, the factual parameters governing this issue will emerge and provide this and other courts with a more consistent framework. *Chesternut* merely provides an example from which we can presently hypothesize.

an intent to observe and approach for questioning. Officer Patrick unquestionably desired to capture and detain Mr. Mamon. Mamon simply was not free to ignore the police and proceed upon his way unrestrained, see *Florida v Royer*, 460 US 491; 103 S Ct 1319; 75 L Ed 2d 229 (1983), after the chase ensued. In accordance with *Shabaz*, Officer Patrick's act of aggressive pursuit demonstrated, in my view, an unjustified act impermissibly interfering with the defendant's Fourth Amendment right to be free from unreasonable seizures.

Hence, under the circumstances of this case, I believe the trial court appropriately granted the defendant's motion to quash. Accordingly, I would affirm the Court of Appeals.

CAVANAGH, J., concurred with ARCHER, J.

LEVIN, J. (*separate opinion*). I agree with the author of the dissenting opinion that

> the presence of a uniformed police officer emerging from a marked police vehicle into an unrestrained, full sprint in pursuit of a citizen, communicates two things: a show of police authority and an intent to capture or detain the person,[1]

and that the record would support a finding that that was what was communicated to Mamon in the instant case.[2]

---

[1] *Ante*, p 27.

[2] Officer Patrick testified on cross-examination as follows:

*Q.* . . . And you said that you looked over, and the defendant was standing at the corner?
*A.* Yes, ma'am.
*Q.* And he took off running?
*A.* Yes, ma'am.
*Q.* Did you then pursue him in your car, or what happened?
*A.* Pursued him on foot.

The implication of *Chesternut* is that if Mamon was "seized by the police before he discarded the [red case] containing the controlled substance,"[3] the evidence should be suppressed. The record, whatever its inadequacies, supports a finding that a reasonable person would not have thought he was "at liberty to ignore the police presence and go about his business"[4] after Officer Patrick "started running after him."[5] It was not until after Patrick started running after Mamon that he took the red case out of his pocket and threw it to the ground.[6]

There was no finding at the trial court level, however, whether, in the words of the United

*Q.* You jumped out of your car and started chasing after him?

*A.* Yes, ma'am.

*Q.* And at that point, he had taken the red case out of his pocket?

*A.* Yes, ma'am.

*Q.* Okay.

*A.* Correction, ma'am. It was before we caught him that he took the case out of his pocket.

*Q.* Okay. It was before?

*A. It was during the chase.*

*Q.* So he took off running; you jumped out of your car, *you started running after him; he took the red case out of his pocket* and threw it to the ground; is that right?

*A.* Yes, ma'am. [Emphasis added.]

[3] *Michigan v Chesternut,* 486 US 567, 574; 108 S Ct 1975; 100 L Ed 2d 565 (1988).

[4] *Id.,* p 569.

[5] See n 2.

[6] The author of the concurring opinion states that "it is possible that the defendant tossed the bag aside very shortly after he began running . . . ." *Ante,* p 21. It appears, however, that Mamon took off running before the officer jumped out of his car and that Mamon discarded the red case "during the chase" after the officer "started running after him." See n 2.

The author of the concurring opinion further states that "it is not clear just what actions of the officer were made known to him before he discarded the bag . . . ." *Id.* The officer stated, however, that he started running after Mamon before he took the red case out of his pocket and threw it on the ground. See n 2.

States Supreme Court in *Chesternut,* " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' "[7] or that the police conduct here would "have communicated to the reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement,"[8] or "that he was not at liberty to ignore the police presence and go about his business."[9]

The magistrate bound Mamon over, finding that there was probable cause to charge him, and stating that whether there had been a violation of the Fourth Amendment "can be raised at a subsequent hearing," adding, somewhat presciently in April, 1987, approximately one year before *Chesternut* was decided: "You will even have the advantage of whatever changes in the law occurs [sic] between now and then."

The Recorder's Court judge granted Mamon's motion to dismiss the information, stating only, "I'm convinced that *Shabaz*[10] is controlling . . . ." *Shabaz* is not controlling.[11] *Chesternut* is.

The evidentiary record was made at the prelimi-

----

[7] *Michigan v Chesternut,* n 3 *supra,* p 573, quoting *United States v Mendenhall,* 446 US 544, 554; 100 S Ct 1870; 64 L Ed 2d 497 (1980) (Stewart, J.).

[8] *Id.,* p 575.

[9] *Id.,* p 569. *Chesternut* is not adverted to in *Brower v Inyo Co,* 489 US 593; 109 S Ct 1378; 103 L Ed 2d 628 (1989). The language quoted in the lead opinion from *Brower* is, as the lead opinion acknowledges, dicta.

[10] *People v Shabaz,* 424 Mich 42; 378 NW2d 451 (1985).

[11] The Michigan Constitution provides that "narcotic drugs" seized outside the curtilage of a dwelling house shall not be suppressed:

The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive

nary examination. The Fourth Amendment issue has not been addressed in a separate hearing focusing on the question whether the evidence seized should be suppressed.[12] *Chesternut* was decided after the information was so dismissed by the Recorder's Court a few months before the Court of Appeals affirmed the dismissal of the information.[13]

Under the circumstances, the most appropriate course of action, I believe, is to remand the case to the Court of Appeals with the direction that the cause be remanded by that Court to the Recorder's Court for the making of a record focusing, in light of *Chesternut,* on the questions posed[14] in the opinions of the justices filed today, and for findings of fact by the Recorder's Court and reconsideration by the Court of Appeals of its decision in light of that record and those findings.

---

or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state. [Const 1963, art 1, § 11.]

[12] There was no motion to suppress or ruling at the trial court level on that question.

[13] The Court of Appeals stated that it believed "that it is clear that defendant in this case was seized as soon as the officers began their chase," and that because he discarded the red case after he was seized, there was an intrusion into his Fourth Amendment rights. *People v Mamon,* 173 Mich App 429, 442; 435 NW2d 12 (1988).

[14] The author of the concurring opinion states:

The record does not indicate (1) how long it took for the police car to pull over and for Officer Patrick to get out of the car, (2) how far away Officer Patrick was when he began to chase the defendant, (3) how far away Officer Patrick was when the defendant discarded the bag of drugs, or (4) whether there were other persons or activities present in the area. [*Ante,* p 20.]