PEOPLE *v.* MEDLEY.

1. INDICTMENT AND INFORMATION—MOTION TO QUASH—EXAMINING MAGISTRATE—ABUSE OF DISCRETION.

    The effect of an order of a trial court granting a motion to quash an information is to constitute a holding that the examining magistrate was guilty of an abuse of discretion (CL 1948, § 766.1 *et seq.*).

2. CRIMINAL LAW—PROBABLE CAUSE—EXAMINING MAGISTRATE.

    Primarily, the question of probable cause is for the consideration of and determination by the examining magistrate (CL 1948, § 766.1 *et seq.*).

3. SAME — PRELIMINARY EXAMININATION — EVIDENCE — PROBABLE CAUSE.

    The evidence necessary on a preliminary examination is merely to establish that an offense not cognizable by a justice of the peace has been committed and that there is probable cause to believe defendant guilty thereof; it being unnecessary for the examining magistrate to determine guilt or innocence or to discharge the accused where there is a conflict of evidence (CL 1948, § 766.1 *et seq.*).

4. SAME—EXAMINING MAGISTRATE—ABUSE OF DISCRETION.

    A trial court has no right to substitute its judgment for that of an examining magistrate, even though he may not agree with it, except in case of a clear abuse of discretion (CL 1948, § 766.1 *et seq.*).

5. SAME—PRELIMINARY EXAMINATION—ASSAULT WITH INTENT TO MURDER—INTENT—EVIDENCE.

    Evidence produced at preliminary examination, that defendant had shot the complaining witness with a revolver *held*, sufficient for examining magistrate to bind defendant over for trial on charge of assault with intent to commit the crime

REFERENCES FOR POINTS IN HEADNOTES

[1, 4]  27 Am Jur, Indictments and Informations § 140.
[2]  14 Am Jur, Criminal Law § 246.
[3]  14 Am Jur, Criminal Law § 241.
[5]  14 Am Jur, Criminal Law § 245.

of murder, since under such a charge one may be convicted of an assault with intent to do great bodily harm less than the crime of murder and intent may be inferred from the act itself, the law presuming every person to intend the usual consequences which accompany the use of the means employed in the manner employed (CL 1948, §§ 750.83, 766.1 *et seq.*).

Appeal from Luce; Runnels (Herbert W.), J. Submitted April 15, 1954. (Docket No. 69, Calendar No. 45,627.) Decided June 7, 1954.

Rhodes O. Medley, after preliminary examination and being bound over for trial on a charge of assault with intent to kill, moved to quash information. Motion granted. Plaintiff appeals. Reversed and remanded.

*Frank G. Millard,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Daniel J. O'Hara,* Assistant Attorney General, *Thomas S. Worsham,* Prosecuting Attorney, for plaintiff.

Sharpe, J. Upon leave being granted, the people appeal from an order of the circuit court of Luce county quashing an information filed by the prosecuting attorney against defendant, Rhodes O. Medley, for assault with intent to kill one Sam Schieber. The facts giving cause for the filing of the information and issuance of the warrant are as follows.

On October 14, 1951, Emory Baumgardner of Jackson, Michigan, drove up to his cabin in Luce county with Rhodes O. Medley and Sam Schieber who were hired by Emory Baumgardner to do some work on a tower. They left Jackson about 1 a.m. and arrived at the Baumgardner cabin about 2 p.m. the same day. There is disputed testimony that on the way up to the cabin the parties did some drinking. Baumgardner unlocked the cabin, and they all

went down to the spring to look for beer which Baumgardner had left there for cooling, but did not find any. When they got back to the car the 3 of them drank most of a pint of whisky. All 3 men returned to the cabin and Baumgardner lay down on the bed in the cabin and went to sleep. He was awakened later by Sam Schieber, who said he was shot and that he had been shot by Rhodes O. Medley while he, Sam Schieber, was returning from the spring.

Baumgardner took Sam Schieber to the hospital at Newberry where the State police and sheriff were notified. The State police and sheriff came out to the camp. They found the defendant lying on a bed in an intoxicated condition. The gun used in the shooting was on a stand in the cabin. The gun contained 2 empty cartridges. Defendant admitted to the officers that he fired the gun that wounded Sam Schieber.

Defendant was taken to the State police headquarters where he was questioned by the officers and the prosecuting attorney. On October 18, 1951, Robert Hallada, a State police officer, signed a complaint before the justice of the peace charging Rhodes O. Medley with the crime heretofore mentioned. An examination was held before the justice of the peace on November 2, 1951. Among other witnesses who testified was Sam Schieber who testified:

"*Q.* What happened to you some time after you arrived there, Sam?

"*A.* Well, I was to go to the water spring and ge some water, there would be probably something down there, a jug or something to get water in. I went down to this, tried to find this, and I walked past it. There is a cabin or 2 probably 400 or 500 feet on wes'; of Baumgardner's cabin. I was down that far with out finding this spring, then I started coming back and probably somewhere around 200 or 300 feet

maybe halfway between this cabin and Baumgardner's cabin, is where Rhodes had shot me.

"*Q.* Did you see him when he shot at you?

"*A.* Yes, sir.

"*Q.* How far away from you was Mr. Medley when he first shot at you?

"*A.* Well probably between 50 and 80 feet.

"*Q.* Was there anything between you and him?

"*A.* There was not.

"*Q.* Could you see him?

"*A.* I could see all of him.

"*Q.* How much of you could he see?

"*A.* He could see all of me. There was very little weeds there.

"*Q.* How tall were the weeds that were between you and Mr. Medley?

"*A.* Well I would say not over 6 inches.

"*Q.* Did you see him before he shot at you the first time?

"*A.* Well I would say approximately the same time.

"*Q.* Was he looking at you?

"*A.* He was looking at me. * * *

"*Q.* Now Sam, you say you had been to this cabin that was down west of Baumgardner's and that you were on the way back to Baumgardner's cabin?

"*A.* I was.

"*Q.* That is when the first shot came at you?

"*A.* It is.

"*Q.* What did you do, yell?

"*A.* I hollered don't shoot and kept moving, circling so I would make a difficult shot.

"*Q.* Did he shoot any more at you?

"*A.* He hit me twice. * * *

"*Q.* Where were you shot, Sam?

"*A.* I was shot in the right side, down in here.

"*Q.* Is that the right side?

"*A.* The left side, and I was shot in the right arm and that fractured my arm bone. That is the bad wound. This other is superficial, it just merely hit and went on through. * * *

"*Q.* What did you do after you had been shot?

"*A.* Well I got back to the cabin and I went in and woke up Baumgardner. He was asleep and I told him that Rhodes had shot me. * * *

"*Q.* Don't tell him what you said to Emory, just what did you do?

"*A.* The next thing, I told him he had to take me to (a) doctor. We went out and unhooked the trailer from the car, backed it around and went to Newberry.

"*Q.* You say you went to the cabin, went in and awakened up Emory and the 2 of you went out, got the trailer unhooked and the car turned around and got in the car and left to come to Newberry. After you had been shot and got away from Medley did you see him after that?

"*A.* Not that I recall, no.

"*Q.* Did you see him around the cabin there?

"*A.* No, sir.

"*Q.* He didn't come up and help unhook the trailer?

"*A.* No, he didn't. I and Emory done that ourselves. * * *

"*Q.* Had you said anything to Mr. Medley in a cross way or did you reprimand him or anything of that sort?

"*A.* With one exception, west of McMillan when he made a dirty remark to a woman I got out and apologized to her and he told me about that and I said I would apologize to him and we would forget it and we shook hands on it and that was all there was to it. * * *

"*Q.* When you apologized to this woman for what Medley had said did Medley say something back to you?

"*A.* Well he didn't seem to like it too well about me getting out and apologizing to her but after that it seemed to be all right."

At the conclusion of the examination defendant, Rhodes O. Medley, was bound over to the circuit court for trial with bail fixed at $10,000. On March

17, 1952, defendant, through his attorney, made a motion to quash the information for the reasons that the complaint and warrant were defective; that defendant was denied a bill of particulars; that the justice of the peace, at the preliminary examination, permitted the introduction of irrelevant and immaterial testimony; that no probable cause was shown; and that there was no intent shown to the effect that Rhodes O. Medley intended to kill or harm Sam Schieber.

On April 14, 1952, the trial court granted the above motion for the reasons as stated:

. "I find that the evidence introduced at the examination does not make a prima facie case, and that there has been a clear abuse of discretion. Defendant's motion will and hereby is granted."

In the case at bar the information and warrant were filed under and by virtue of CL 1948, § 750.83 (Stat Ann § 28.278) which states:

"Any person who shall assault another with intent to commit the crime of murder, shall be guilty of a felony, punishable by imprisonment in the State prison for life or any number of years."

Under the above statute an information charging an assault with intent to murder sustains a conviction of the lesser offense of an assault with intent to do great bodily harm less than the crime of murder. See *People* v. *Prague,* 72 Mich 178, and *People* v. *Townsend,* 120 Mich 661.

The purpose of this appeal is to determine the validity of the action of the trial court in granting the motion to quash the information. The effect of granting defendant's motion constituted a holding that the examining magistrate was guilty of an abuse of discretion, see *People* v. *Dellabonda,* 265 Mich 486. In the above case we said (p 491):

"Primarily the question of probable cause is for the consideration of and determination by the examining magistrate."

Does the evidence justify, as a matter of law, the holding of the trial judge that the examining magistrate was guilty of an abuse of discretion? The answer to this question depends on whether, as a matter of law, there was sufficient evidence to hold the defendant to trial, see *People* v. *Auerbach,* 176 Mich 23 (Ann Cas 1915B, 557). The weight and sufficiency of evidence necessary on a preliminary examination is well stated in 1 Gillespie, Michigan Criminal Law and Procedure (1st ed), § 224:

"The statute* is directory as to the quantity of testimony to be taken. What is intended is that the magistrate shall receive such testimony from the complainant and his witnesses as may be offered, and then act upon it. The object of the examination is not to determine guilt or innocence, and it is not as necessary to make strict proof as on the trial. The magistrate does not act judicially in a technical sense. He is not required to nicely weigh the evidence as a petit jury, or to discharge the accused where there is a conflict of evidence, or where there is a reasonable doubt as to his guilt, as all such questions should be left to the jury upon the trial. It is not necessary to establish the respondent's guilt beyond a reasonable doubt before the examining magistrate, but only to offer proof that an offense not cognizable by a justice of the peace has been committed, and there is probable cause to believe the defendant guilty thereof. The statute does not contemplate a commitment upon evidence that does not make a prima facie case of guilt. Primarily the question of probable cause is for the consideration and determination of the examining magistrate. While the trial court may not agree with the findings of such mag

_____
* See CL 1948, § 766.1 *et seq:* (Stat Ann § 28.919 *et seq.*).—RE-PORTER.

istrate, it has no right to substitute its judgment for his, except in case of a clear abuse of discretion."

In the case at bar there is positive evidence that defendant, Rhodes O. Medley, shot Sam Schieber with a revolver. The question of what his intention was in so doing may be determined from the evidence produced at the examination, as intent may be inferred from the act itself. In *People* v. *Hodges,* 196 Mich 546, we said (p 551):

"The law presumes every person to intend the usual consequences which accompany the use of the means employed in the manner employed."

In our opinion there was evidence produced at the examination on the question of defendant's intent in shooting Sam Schieber. It was not the function of the trial judge to substitute his judgment for that of the examining magistrate. The order of the circuit court in quashing the information is reversed and the cause remanded to the circuit court for arraignment and appropriate proceedings upon the plea to be entered.

Butzel, C. J., and Carr, Bushnell, Boyles, Reid, Dethmers, and Kelly, JJ., concurred.