669 N.W.2d 797 (2003)
PEOPLE of the State of Michigan, Plaintiff-Appellee,
v.
Dennis RICHARDSON, Defendant-Appellant.
Docket No. 120223, COA No. 234208.
Supreme Court of Michigan.
October 16, 2003.
By order of March 18, 2002, the application for leave to appeal was held in abeyance pending the decision in People v. Yost (Docket No. 119889). On order of the Court, the opinion having been issued on April 23, 2003, 468 Mich. 122, 659 N.W.2d 604 (2003), the application is again considered, and it is DENIED because we are not persuaded that the questions presented should be reviewed by this Court.
CORRIGAN, C.J., concurs and states as follows:
I concur in the order denying leave to appeal. Defendant, a Lord & Taylor security guard, was charged with involuntary manslaughter arising out of an altercation in the parking lot of a mall. The altercation began when security personnel confronted suspected shoplifters. The victim, Frederick Finley, was seated in a nearby car and entered the fray in an apparent effort to prevent the arrest of the suspects. Defendant put his arm around the victim's neck, subdued him and knocked him to ground. Defendant then held the victim in this manner on the ground. The victim was rendered unconscious, and he was pronounced dead after reaching a hospital.
The prosecutor's medical expert, Dr. Boguslaw Pietak, performed an autopsy and concluded that the cause of death was asphyxia due to neck compression. A defense medical expert, Dr. Ljubisa Jovan Dragovic, opined that the stress and excitement of the altercation had caused the victim's heart to fail.
Following a preliminary examination, the district court dismissed the case. The court found insufficient evidence that the victim had died of asphyxia and that defendant's conduct amounted to gross negligence. The circuit court reversed and reinstated the case. The Court of Appeals denied leave to appeal,[1] but this Court then remanded the case to the Court of Appeals for consideration as on leave granted.[2] On remand, the Court of Appeals affirmed the circuit court order reinstating the charge of involuntary manslaughter.[3]
In conducting a preliminary examination, the magistrate does not act as the trier of fact. The magistrate thus may not refuse to bind a defendant over for trial merely because the evidence conflicts or raises a reasonable doubt of the defendant's guilt. People v. Yost, 468 Mich. 122, 659 N.W.2d 604 (2003).
*798 In this case, the circuit court thoroughly analyzed the evidence presented at the preliminary examination and concluded that factual issues existed for the jury to resolve. The court concluded that the magistrate had improperly weighed evidence and had improperly made a credibility choice between the competing medical experts.
The circuit court observed that the medical experts had agreed on many physical findings, but differed in their conclusions regarding the cause of death. Dr. Pietak's examination revealed bruising and hemorrhaging, suggesting that the blood vessels in the victim's neck had been compressed. Blunt force trauma or pressure applied to the neck, such as a choke hold or carotid hold, would have caused those bruises. Dr. Dragovic agreed that blunt force trauma had occurred, but he opined that the strain of the physical confrontation had led to heart failure.
The circuit court also noted that several witnesses had presented conflicting testimony regarding defendant's actions and the victim's behavior and medical condition during the altercation. These evidentiary conflicts included:
 Whether the victim's leg and other movements resulted from convulsions or voluntary action;
 Whether the victim was kicking, raising himself off the ground, or resisting in a combative manner;
 Whether the victim was breathing and speaking, or unconscious;
 Whether the victim had a pulse;
 Whether the petechia in the victim's larynx was caused by intubation or asphyxia;
 Whether the victim suffered physical trauma;
 Whether the victim died from asphyxia; and
 The amount of force that defendant used on the victim.
The circuit court noted that defendant was the only person known to have been on top of the victim, with his arms around the victim's neck and head, while the victim was handcuffed.
The circuit court correctly concluded that the evidence presents factual issues to be resolved at trial. It is for the jury to determine whether the amount and duration of force applied to defendant's neck was reasonable or excessive under the circumstances, and whether that force caused the victim's death. The magistrate improperly invaded the jury's domain in resolving those issues.
TAYLOR, J., dissents and states as follows:
I would peremptorily reverse the judgment of the Court of Appeals because I agree with Justice Markman that the magistrate did not abuse her discretion in concluding there was no probable cause to bind defendant over on charges of involuntary manslaughter due to gross negligence.
MARKMAN, J., dissents and states as follows:
I would peremptorily reverse the judgment of the Court of Appeals because I do not believe that the magistrate abused her discretion in concluding that there was no probable cause to bind defendant over on charges of involuntary manslaughter on the basis of gross negligence. In my judgment, not only did defendant not act in a grossly negligent manner, but, when considered in light of all the circumstances, his actions were reasonable.

I. Facts
This case arises out of the June 22, 2000, death of Frederick Finley, in the parking *799 lot of the Lord & Taylor department store in Fairlane Town Center in Dearborn. Defendant was employed by Lord & Taylor as a loss prevention officer and security guard. Defendant and fellow security officers observed a group of four individuals engaged in suspected shoplifting of merchandise at the store.[1] Finley was part of this group of individuals.[2] The officers stopped the group outside the store to inquire about what had been observed. After telling Carla Finley that Tiara Walker had been observed stealing a bracelet and that the group would have to return to the office to fill out paperwork regarding the incident, Carla Finley became hostile. She, Walker, and the other individuals in the group ignored this request and continued walking toward their car, about seventy-five feet from the store entrance. As members of the group began getting into their car, the security guards told them that they could not leave the premises. At this point, Finley, a 5' 10", 273-pound man, got out of the driver's seat of the car and approached Officer Nowlin who was standing behind the car. Finley stated to Nowlin: "I will kick your ass," and then, with both fists, punched Nowlin in the chest. The force of these blows knocked Nowlin back into a parked car. Carla Finley, described by Linnea Booth as a "woman much larger" than her, then assaulted Booth, throwing "wild punches," striking her about the face, and knocking her glasses off. Carla Finley then grabbed Booth around the neck with her hand and wrestled her to the ground. As Booth was pinned on the ground and still being assaulted by Carla Finley, she yelled for Mary Graney to assist her. When Graney attempted to grab Carla Finley's arm, both Finley and Walker began to beat Graney, hitting her in the face and on the back as she crouched in a defensive posture. Booth then got up and attempted to aid Graney. Realizing that they were dealing with an extremely violent situation, both Booth and Graney put their hands up and told Carla Finley to stop. However, Carla Finley continued her assault on Booth. When Graney turned to summon additional help, Carla Finley began to enter the vehicle and yelled: "pop the fucking trunk, pop the fucking trunk, I'm gonna shoot everybody." During this time, Frederick Finley continued to assault Nowlin, who yelled for someone to prevent the trunk from being opened. Both Booth and Roderick Alexander went to the trunk of the vehicle to prevent Carla Finley from gaining access to it. Walker and Carla Finley then got into the car at the urging of Gordon, who stated that they would come back later for Frederick Finley. Booth attempted to pick her glasses up off the ground, and the driver of the car placed it into reverse and began driving toward Booth. Booth testified that she pushed off from the vehicle to prevent it from hitting her. Meanwhile, Frederick Finley was struggling with defendant and Nowlin. Defendant eventually restrained the victim only after, according to the circuit court, he "got his arm around [Mr. Finley's] large neck and succeeded in subduing [him], finally throwing or knocking him to the ground." The remainder of the group fled in the car. Finley continued to kick and to struggle while he was on the ground and, although one witness stated that the guards were "a little bit rougher than they needed to be," all the witnesses *800 agreed that it did not appear that defendant was choking or strangling the victim.[3] Finley later died on the way to the hospital. Defendant received multiple abrasions on his arms and shoulders, and received a "pretty bad cut" on his forehead as a result of the struggle with Mr. Finley.[4]
Defendant was charged with involuntary manslaughter.[5] It was the prosecutor's theory that defendant had acted in a "grossly negligent" manner, that defendant had actually choked or strangled Mr. Finley, and that the cause of death was asphyxiation. At a preliminary examination to determine whether probable cause existed to bind defendant over for trial, the magistrate concluded that there was insufficient evidence to find that defendant had committed the crime of involuntary manslaughter. She found that the prosecutor's expert witness, Wayne County Assistant Medical Examiner Boguslaw Pietak, lacked credibility regarding the cause of Finley's death. According to the magistrate, Pietak's opinion that Finley had been asphyxiated as a result of force applied to his neck was not based on medically objective findings. The magistrate found it significant that normal objective findings for asphyxiation, such as broken blood vessels in the eyelids, eyes, and face, were not present. The magistrate further questioned Pietak's credibility because his opinion regarding the cause of death was rendered before reviewing the toxicology results.[6] Instead, the magistrate found defendant's expert witness, Oakland County Chief Forensic Pathologist Ljubisa Jovan Dragovic, to be more credible, and determined, consistently with Dragovic's opinion, that the cause of Finley's death was acute heart failure.[7] Dragovic's testimony was corroborated in significant respects by emergency medical services personnel who attended to Finley shortly after the altercation and on the way to the hospital, as well as by the emergency room physician, Dr. Daniel Gadzinski.
The prosecutor appealed the decision of the magistrate, and the circuit court reversed, finding that the magistrate abused her discretion and that there was sufficient evidence to bind defendant over on the *801 charge of involuntary manslaughter. The Court of Appeals affirmed and defendant appealed. We remanded to the Court of Appeals,[8] ordering that Court to address the following issues:
(1) whether the district court clearly abused its discretion when it determined that the evidence here was insufficient to establish probable cause that defendant acted with gross negligence in this involuntary manslaughter case, i.e., whether defendant's conduct exhibited a "wantonness and disregard of the consequences which may ensue, an indifference to the rights of others that is equivalent to criminal intent." People v. Datema, 448 Mich. 585, 596, 533 N.W.2d 272 (1995), (2) assuming that sufficient evidence existed on the issue of gross negligence, what precise conduct on defendant's part constituted such gross negligence, and (3) assuming that sufficient evidence existed on the issue of gross negligence, what evidence in particular supports the conclusion that defendant's conduct satisfied the "wantonness and disregard of the consequences" standard of People v. Datema. [464 Mich. 852, 627 N.W.2d 601 (2001).]
Upon consideration, the Court of Appeals affirmed the circuit court's finding that the magistrate had abused her discretion when she concluded that there was insufficient evidence of gross negligence. First, the Court concluded that the magistrate abused her discretion in refusing to bind defendant over because the magistrate should have treated, as a question properly reserved for the jury, the conflicting accounts offered by medical experts concerning Finley's cause of death. Slip op. at 3. Second, the Court of Appeals concluded that the magistrate abused her discretion in finding "that there was no evidence that defendant's conduct amounted to gross negligence." Slip op. at 3. Concerning this conclusion, the Court found that the magistrate again abused her discretion, because, in the Court's words: "the finding [that the defendant did not act with gross negligence] was inextricably intertwined with the magistrate's improper determination of credibility [of the expert witnesses]." Slip op. at 5.
In my judgment, the Court of Appeals erred in determining that the magistrate abused her discretion when it concluded that there was insufficient evidence, on the whole record, to find that the defendant acted with gross negligence.

II. Probable Cause
This case must be assessed in terms of the magistrate's duties during a "probable cause" hearing, and in light of the circuit court's standard of review, specifically an abuse of discretion standard. By statute, the magistrate presiding over a preliminary examination is to "examine the complainant and the witnesses in support of the prosecution, on oath ..., in regard to the offense charged and in regard to any other matters connected with the charge that the magistrate considers pertinent." M.C.L. § 766.4. Further, M.C.L. § 766.13, provides:
If it shall appear to the magistrate at the conclusion of the preliminary examination either that an offense has not been committed or that there is not probable cause for charging the defendant therewith, he shall discharge such defendant. If it shall appear to the magistrate at the conclusion of the preliminary examination that a felony has been committed and there is probable *802 cause for charging the defendant therewith, the magistrate shall forthwith bind the defendant to appear before the circuit court of such county, or other court having jurisdiction of the cause, for trial.
This statute establishes that the magistrate's duty is to determine whether probable cause exists for binding a defendant over on the charges asserted. Moreover, when making a determination of probable cause, the magistrate is to examine the whole matter. People v. King, 412 Mich. 145, 154, 312 N.W.2d 629 (1981), citing People v. Evans, 72 Mich. 367, 386-387, 40 N.W. 473 (1888).
"The object of the [preliminary] examination is not to determine guilt or innocence...." People v. Medley, 339 Mich. 486, 492, 64 N.W.2d 708 (1954). Rather, it is an examination to consider, preliminarily, whether the circumstances of a particular case give rise to probable cause to hold an individual for further criminal proceedings. Probable cause is defined as "a reasonable ground of suspicion, supported by circumstances strong [in themselves] to warrant a cautious person in the belief that the accused is guilty of the offense charged." People v. Woods, 200 Mich.App. 283, 288, 504 N.W.2d 24 (1993), see also 3 Bouvier's Law Dictionary (3d ed.) at 2728. Justice Cooley noted the protective nature of the preliminary examination when he stated: "[t]he examination ... was designed, to some extent, to accomplish the purpose of ... protecting a party against being subjected to the indignity of a public trial for an offense before probable cause has been established against him by evidence under oath." People v. Annis, 13 Mich. 511, 515 (1865).
Thus, when a circuit court engages in review of a magistrate's determination for abuse of discretion, such review must be undertaken with a consideration of the magistrate's duty to find, from all the circumstances, "reasonable ground of suspicion... to warrant a cautious person" to find that probable cause exists. Woods, supra at 288, 504 N.W.2d 24.

III. Abuse of Discretion
Having established that the magistrate's authority is to make a determination, based on the whole matter, that probable cause does or does not exist in a given case, the question for the reviewing circuit court becomes whether, in making that determination, the magistrate has abused her discretion. Such abuse exists only if the conclusion reached by the magistrate is so violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or an exercise of passion or bias. As this Court noted in Alken-Ziegler Inc. v. Waterbury Headers Corp., 461 Mich. 219, 227, 600 N.W.2d 638 (1999), "abuse of discretion involves far more than a difference in judicial opinion." While a court may not agree with the findings of a magistrate, "it has no right to substitute its judgment for his, except in case of a clear abuse of discretion." Medley, supra at 492-493, 64 N.W.2d 708, see also People v. Talley, 410 Mich. 378, 384, 301 N.W.2d 809 (1981). Such abuse must be apparent. Id. at 385, 301 N.W.2d 809.

IV. Analysis
In my judgment, the magistrate fulfilled her statutory duties, and rightfully considered all the circumstances in concluding that there was no probable cause to bind defendant over on the charge of involuntary manslaughter. Further, I believe that the conclusions of the trial court and the Court of Appeals that the magistrate abused her discretion were merely "a difference of judicial opinion," and therefore insufficient to justify overturning the magistrate's conclusion. Alken-Ziegler, supra at 227, 600 N.W.2d 638 (1999).

*803 A. Gross Negligence
The Court of Appeals concluded that the magistrate abused her discretion in finding that there was insufficient evidence to establish probable cause that defendant acted with gross negligence. When an involuntary manslaughter charge is based on the theory that the defendant carelessly performed a lawful act, the carelessness required must be "gross." Datema, supra at 596, 533 N.W.2d 272. That is, a defendant's conduct must exhibit "wantonness and disregard of the consequences which may ensue, an indifference to the rights of others that is equivalent to a criminal intent." Id., quoting People v. Barnes, 182 Mich. 179, 198, 148 N.W. 400 (1914). "Involuntary manslaughter occurs when death results from negligence which is gross, wanton or wilful, or criminal, indicating a culpable indifference to the safety of others." People v. Rettelle, 173 Mich.App 196, 433 N.W.2d 401 (1988), see also Datema, supra at 597, 533 N.W.2d 272.
I see no conduct on the part of defendant that could reasonably lead to a conclusion that he acted with such a wantonness or indifference to the rights of the victim here. Finley, a 5' 10", 273-pound man, threatened defendant and his coworkers with bodily injury and actually attacked them, punching at least one of the officers in the chest and knocking him back into a parked car. At this same time, the other female security personnel, Booth and Graney, were under physical attack from Finley's colleagues, one of whom was also threatening to retrieve a gun from the trunk of her car and "shoot everybody." Booth testified further that during the altercation, the driver of the car actually attempted to run her and the other security personnel over. Defendant was engaged in nothing more than an effort to carry out his professional responsibilities by subduing a suspected shoplifter-grown-violent, in the process receiving multiple abrasions and a "pretty bad cut" on his forehead.[9]
On the basis of this evidence, I do not believe that it can be said by any standard that defendant acted with a "wantonness or disregard" for the rights of Finley. As this Court noted in Barnes, supra at 198, 148 N.W. 400, "to make an act carelessly performed resulting in death a criminal one, the carelessness must be gross, implying an indifference to consequences; `gross negligence' means something more than mere negligence. It means wantonness and disregard of the consequences which may ensue, and indifference to the rights of others that is equivalent to a criminal intent." Here, the defendant responded in defense of himself, and of his colleagues, to the assault by the victim, a suspected criminal, and his coconspirators. Further, there was no evidence that the defendant attempted to beat the victim or to inflict additional violence upon him, even though having eventually attained the upper hand in their struggle.
The question remains, then, where specifically in the record of this case can be found the "`wantonness and disregard of the consequences which may ensue,'" on the part of defendant and "`the indifference to the rights of others that is equivalent to criminal intent'"? Datema, supra at 596, 533 N.W.2d 272 (citation omitted). Was it when defendant followed the group *804 of shoplifters out of the store, in the performance of his responsibilities to his employer, in order to confront them? Was it when defendant attempted to prevent Finley from assaulting and injuring his colleague Nowlin? Was it when defendant continued to subdue Finley as other members of Finley's group were threatening to get a gun from the trunk of the car and "shoot everybody"? Defendant's conduct, in my judgment, simply does not rise to that level of wanton and reckless disregard required to find probable cause that defendant has committed involuntary manslaughter. It is apparently the fact of the victim's death, ipso facto, that forms the basis for a finding here of gross negligence.[10]
Moreover, I find no indication that defendant's conduct, in light of the circumstances, was unreasonable, much less grossly negligent. A person's conduct is to be judged in terms of what is occurring at that moment, not on the basis of 20/20 hindsight. Since one's conduct is to be considered in terms of a reasonable person under the circumstances, defendant's actions must be viewed from the perspective of the reasonable security guard faced with a quickly escalating, volatile and violent physical attack. As one court has noted:
Although some carelessness or negligence [may be] shown in this record, we cannot say that it rose to the level of gross negligence required to sustain a conviction. It is not sufficient to say, with 20/20 hindsight, that the [defendant] could have, or should have, done some things differently.... The failure to perceive the risk must be a gross deviation from the standard of care that an ordinary person would exercise under the circumstances. [State v. Owens, 820 S.W.2d 757, 760-761 (Tenn.Crim.App., 1991) (emphasis added).]
The United States Supreme Court, in the analogous situation of analyzing a police officer's actions in the context of Fourth Amendment protections has stated:
The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,"... violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolvingabout the amount of force that is necessary in a particular situation. [Graham v. Connor, 490 U.S. 386, 396-397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).]
*805 In my judgment, not only does it appear that this defendant did not act with "wanton disregard" but, in fact, it appears that he acted reasonably under the circumstances when they are viewed from the perspective of a reasonable person finding himself in this type of difficult situation. Rather than showing "`culpable indifference to the safety of others,'" Datema, supra at 597, 533 N.W.2d 272 (citation omitted), defendant, in coming to the assistance of Nowlin, instead showed remarkable concern for the safety of others, specifically for his threatened colleague. It may be possible to conclude on the basis of hindsight that defendant could have used less force and still subdued Finley. Yet in light of all the circumstances, it simply cannot be said that the amount of force defendant used constituted gross, wanton or willful negligence. Such after-the-fact calibrations and finely tuned analyses are not the basis for assessing the existence of gross negligence. The defendant was required to act swiftly under stressful circumstances in an effort to subdue a member of a group of suspected criminals who were assaulting and threatening to kill clearly identified security personnel.

B. Expert Testimony
The Court of Appeals also concluded that the magistrate abused her discretion in determining the credibility of the expert witnesses. According to the Court of Appeals, the magistrate's abuse of discretion in this regard was intertwined with her abuse of discretion in her conclusion that there was no probable cause to suspect that defendant's conduct rose to the level of "gross negligence". They stated that "the magistrate erred by finding Pietak's testimony to be lacking in credibility with regard to the cause of Finley's death. As a result, the magistrate failed to take into consideration his testimony in arriving at her conclusion that there was evidence of gross negligence." Slip op. at 5. The Court of Appeals and the circuit court focused on the magistrate's rejection of the state's expert testimony as lacking in credibility. However, as I have already suggested, the determination of probable cause cannot be undertaken in a vacuum or on the basis of discrete or isolated findings by the magistrate; rather, the whole matter must be considered. King, supra at 153-154, 312 N.W.2d 629. See also, People v. Evans, 72 Mich. 367, 387, 40 N.W. 473 (1888); Yaner v. People, 34 Mich. 286, 288-290 (1876) (referring to the whole examination and the examination of the whole matter). Even if one disagrees with the magistrate's "credibility" determinationand I reject Chief Justice Corrigan's view that the magistrate can make no credibility determinations whatsoever such disagreement in no way undermines the magistrate's larger conclusion that defendant here was not grossly negligent. As the magistrate observed, there was simply no evidence that defendant used excessive force or acted in a grossly negligent manner.
The Court of Appeals conclusion is essentially reduced to its "substituted judgment." In reviewing a magistrate's determination as to probable cause, a court may not substitute its judgment unless there has been a clear abuse of discretion. Talley, supra at 385, 301 N.W.2d 809 (1981).
Considering the whole matter presented to the magistrate, including the testimony of Dr. Pietak and that of the other expert witnesses and lay witnesses, I simply am unable to conclude that the magistrate abused her discretion in finding that there was insufficient evidence of gross negligence to bind defendant over for trial. The magistrate did not abuse her discretion in determining (a) that the testimony of other witnesses, expert and lay, better corroborated the testimony of Dr. Dragovic *806 and (b) that the relatively casual investigation carried out by Dr. Pietak, in comparison with that of Dr. Dragovic, required that greater weight be given to the latter's testimony. Dr. Pietak concluded that defendant had been asphyxiated, strangled, or choked to death. He pointed to hemorrhaging in the deep, not external, muscles of the upper chest and neck as an indication of this. Dr. Pietak also noted general congestion in the head and neck area. Further, he discounted the fact that Finley apparently retained consciousness throughout the struggle, and did not succumb to death until he was later transported to the hospital. On the other hand, Dr. Dragovic concluded that Finley died from congestive heart failure. Dr. Dragovic testified that there was evidence that Finley had an enlarged heart, lungs, and liver. Dr. Pietak confirmed that Finley's heart was abnormally large. Further, Dr. Dragovic concluded that suffusion, the back-up of return blood vessels to the heart, resulting in the presence of large amounts of blood in the neck and chest area, had resulted from Finley's heart failure. This is an alternate explanation for the general congestion in Finley's upper chest and neck observed by Dr. Pietak. Dr. Dragovic also stated that hemorrhaging within the inner or deep muscles of the neck could have been caused by the multiple attempts made by the EMS personnel to place a tube down Finley's throat. Further, Dr. Dragovic testified that "petechiae", a traditional indicator of strangulation characterized by tiny bursted blood vessels in the face and eyes were not present in Finley. Dr. Dragovic also testified that he had not heard of a case in which death by asphyxiation had not been preceded by sudden unconsciousness; Finley's ability to breathe and struggle after the alleged strangulation event, and even after defendant got off him, indicates that this would not have been such a case. Perhaps equally telling was the testimony of Dr. Gadzinski, the treating emergency room physician on Finley's arrival at the hospital. He testified, as a qualified expert in emergency medicine, that Finley had died of cardiac arrest. Dr. Gadzinski, with nearly twenty years of experience in an emergency room, testified that there were no signs of asphyxiation on Mr. Finley's body, no signs of "petechiae," and no signs of external physical trauma; no "bruising," no "abrasion," and no "redness" on or about Finley's neck, face, or head. Dr. Gadzinski corroborated Dr. Dragovic's conclusion that Finley could not have been breathing, and could not have had a heartbeat had he died of an asphyxiation that occurred before these observations. Dr. Gadzinski also agreed with Dr. Dragovic that the internal hemorrhaging was likely the result of the failed intubation attempts.
The testimony of Drs. Dragovic and Gadzinski is also more consistent with that of each of the lay witnesses who testified. All the lay witnesses stated that defendant was not choking or strangling Finley.[11] Further, when reviewed as a whole, the testimony demonstrates that Finley was still alive after defendant had gotten off him. Douglas Heichlinger, Lord & Taylor's general manager, testified that, when the mall security guards arrived on the scene, Finley was still struggling with defendant. Tania Ellis, one of those guards, testified that she was concerned that Finley was still a threat because he was handcuffed *807 in the front, rather than the rear, and because defendant was no longer on top of him. As noted, she observed that Finley had a "strong heartbeat" and was "breathing fine." Timothy Ryan, another Lord & Taylor manager who arrived at the scene at the same time as the mall security guards, testified that, as he approached the scene, Finley was struggling with defendant, and that Finley "turned his head to the right ... toward [Mr. Ryan] and he said `all this over fifty dollars.'" This testimony was consistent with Dr. Dragovic's conclusion that Finley was not asphyxiated; i.e., that Finley was not choked or strangled to death.[12] Thus, the magistrate did not, in my view, abuse her discretion by assessing both the lay testimony and the expert testimony and concluding, on the basis of all this evidence, that probable cause was lacking to bind over defendant.
Finally, the magistrate is entitled to considerable deference in this process because it is the magistrate who has heard the testimony and viewed the demeanor of the witnesses, unlike the appellate judge who must form a judgment solely from the printed record. People v. Paille # 2, 383 Mich. 621, 627, 178 N.W.2d 465 (1970). As this Court has noted in the analogous situation of a trial judge's findings of fact:
[T]he Court generally gives great weight to the findings of fact of the trial judge.
The trial court is our arena for the test of truth. There the contesting parties and their witnesses appear face to face in flesh and blood with weight and size and demeanor under the eye of the trial judge. He sees the averted glance, marks the hesitation, detects the note of hysteria in the voice of a witness whose words may be calculated to deceive. The cold words on a printed page show none of these essentials to the search for fact. [Hartka v. Hartka, 346 Mich. 453, 455, 78 N.W.2d 133 (1956) ].
The conclusions of the magistrate with regard to the expert testimony, as with her conclusions with regard to gross negligence, were well within her discretion, and it was error, in my view, for the Court of Appeals to have substituted its own judgment and to have concluded otherwise. Talley, supra at 385, 301 N.W.2d 809. It is not the magistrate's conclusion concerning one discrete aspect of the evidencein this case, the testimony of a single expertthat is to be reviewed for abuse of discretion. Rather, when determining whether the magistrate has abused her discretion in finding that there was, or was not, probable cause to sustain a charge, the matter as a whole must be examined. King, supra at 154, 312 N.W.2d 629.

V. Response to the Concurrence
The concurrence begins with an extremely truncated version of the altercation, politely describing Finley's actions as an effort to "prevent the arrest of the suspects." The concurrence then sets forth a number of questions that it alleges are in evidentiary conflict, questions that, in the opinion of the concurrence, require bindover. In my judgment, these consist of questions concerning what is either insubstantial conflict or is irrelevant to whether defendant acted in a grossly negligent manner.
*808 First, the concurrence states that a dispute exists concerning whether Finley's "movements resulted from convulsions or voluntary actions." This observation requires consideration of two aspects. The first is whether defendant acted with gross negligence in not considering the possibility that Finley may have been suffering convulsions requiring a cessation of restraint, and the second concerns whether the speculative theory that Finley was suffering convulsions supports a finding of asphyxia. With regard to the first aspect, it was the prosecutor, not the eyewitnesses, who introduced the theory that Finley's actions possibly resulted from convulsive movements. Lord & Taylor General Manager Douglas Heichlinger, an eyewitness to the event, stated in his deposition that during the time defendant was actively restraining Finley, Finley was continually resisting, not "reacting." In my opinion, if it did not occur to the eyewitnesses that Finley's actions might have been a result of convulsive movements, then we simply cannot assume that defendant himself should have known and, therefore, that he acted with gross negligence in recognizing this fact and in not ceasing his restraint of Finley. With regard to the second aspect, the prosecutor introduced the speculative convulsive movement theory to support its argument that Finley died of asphyxia, because voluntary movements during and after the altercation would otherwise have refuted a claim of asphyxia. However, despite the efforts of the prosecutor to prove otherwise, the available evidence indicates that Finley continued breathing after the physical altercation. Even Dr. Pietak testified that, if Finley continued breathing after the altercation, he could not have died as a result of asphyxiation that occurred during the altercation. Therefore, the prosecutor's speculation about whether Finley's actions resulted from convulsive movements is just that, speculation.
Second, the concurrence states that whether Finley "was kicking, raising himself off the ground, or resisting in a combative manner; whether [Finley] was breathing and speaking, or unconscious; [and] whether [Finley] had a pulse" are all issues in factual dispute. It is undisputed that at some point, Finley became unresponsive. However, both Heichlinger and another eyewitness, operations manager Timothy Ryan, stated that when they arrived on the scene, defendant was engaged in restraining Finley, but that Finley continued "kicking and moving around" in an apparent attempt to get to his feet. When Ellis subsequently arrived on the scene, she testified that she did not see Finley resisting or speaking. However, Ellis further testified that neither Finley nor defendant was moving when she arrived on the scene. This corroborates the testimony of Heichlinger, who stated that Finley was actively resisting until approximately the point in time when Ellis arrived on the scene. Further, those present before Ellis testified that Finley was speaking until about the time of Ellis's arrival on the scene. Thus, upon closer examination, it does not appear to me that the evidence on these issues is in actual conflict. Further, that Finley at some point started to lose consciousness is obvious in light of his death, but it is not an indication of gross negligence on defendant's part.
With regard to evidence of Finley's breathing and pulse, one witness, Dan Ayotte, testified that when he arrived on the scene, it appeared to him from a distance that Finley was not breathing. However, eyewitness Ellis was equipped with a sound recording device that was on and running at the scene of the event. On the sound recording, Ellis can be heard stating, not once, but twice, that although *809 Finley was unresponsive, he was breathing and had a strong heartbeat. Both these statements were made after the physical altercation had ended, and both were made in direct observation of the event as it occurred, and not later during a deposition. Ellis additionally testified that she and the off-duty emergency medical technician on the scene checked Finley's pulse and that it was 60. A medic who arrived on the scene approximately four minutes after the altercation had ended stated that he checked Finley's pulse and it was 32, and that he put Finley on a heart monitor. It was a minute later, and several minutes after the altercation, that Finley ceased all heart activity. Thus, in light of the fact that those who actually checked Finley, including trained emergency medical services personnel, stated at the scene that Finley was breathing and had a pulse, I do not think Ayotte's deposition testimony regarding appearances from afar raises an evidentiary dispute of genuine significance. Further, even if it is assumed for the sake of argument that Finley had already ceased breathing at the end of the physical altercation, this still should not, ipso facto, form a basis for a finding of gross negligence.
Third, the concurrence states that it is disputed "whether the petechia in [Finley's] larynx was caused by intubation or asphyxia, whether [Finley] suffered physical trauma and whether [Finley] died of asphyxia." It is true that Dr. Pietak and Dr. Dragovich reach different conclusions on these points.[13] I have already addressed why the magistrate did not abuse her discretion in concluding, on the basis of a consideration of all the evidence and circumstances, that Dr. Pietak's testimony does not necessitate finding probable cause to bind defendant over on manslaughter charges. However, most telling is the fact that not a single eyewitness to the event testified that defendant choked or strangled Finley. On the contrary, all witnesses agreed that defendant did not appear to be choking or strangling Finley, and not one testified that defendant appeared to be using excessive force. The fact that some physical symptoms might support a finding of asphyxia (namely, the congestion in the neck area and hemorrhaging, and the damage to Finley's larynx) does not require finding probable cause to bind defendant over when: (1) those same physical symptoms also support a finding of congestive heart failure; (2) all additional physical symptoms support a finding of congestive heart failure; (3) classic signs of asphyxia were notably absent; and (4) the eyewitnesses testified that defendant did not choke or strangle Finley and that Finley continued breathing and had a pulse even after the physical altercation.
Finally, the concurrence states that the amount of force defendant used in restraining Finley is an issue in evidentiary dispute. If the concurrence is looking for a mathematical equation specifying the exact amount of forced used, none can be provided. However, as already noted, not one eyewitness testified that defendant was using excessive force in restraining Finley. And not one eyewitness testified that it appeared that defendant was choking or strangling Finley. Dr. Dragovich testified that within "seven to ten seconds" of a carotid hold being applied, the victim will go limp. This may be true, but not a single eyewitness testified that a carotid hold was applied. There is simply no evidence to conclude that defendant's use of force constituted gross negligence.
*810 I do not doubt that a magistrate may not refuse to bind a defendant over for trial merely on the basis of preferring some substantial evidence to other substantial evidence. See People v. Yost, 468 Mich. 122, 659 N.W.2d 604 (2003). However, in this case, the magistrate refused to bind defendant over for trial not merely because the evidence conflicted or raised a reasonable doubt regarding guilt, but because, in her judgment, the evidence, viewed as a whole matter, did not satisfy the threshold requirement of probable cause. In making this determination, the magistrate did not simply discount Dr. Pietak's testimony,[14] but rather she considered it thoroughly, evaluating it closely in the context of other expert and lay testimony, and determined that it did not rise to a level of probable cause.
Although, I do not believe that Dr. Pietak's testimony, even if fully credited, allows a finding of gross negligence, even if it did allow such a finding, the concurrence errs in its premise that any conflict between testimonies at the preliminary examination requires a bindover, lest the magistrate be engaged in the assessment of credibility. However, if a magistrate is obligated to accept at face value any testimony, there would be little reason to allow for cross-examination or for a defense presentation at all at the preliminary examination. If the magistrate's only task was to verify that the prosecutor had presented some cognizable evidence on each element of an offense, then the magistrate could simply review supporting affidavits and issue a bindover decision without hearing live testimony. Because M.C.L. § 766.12 specifically provides for the operation of the adversarial process at the preliminary examination, it is reasonable to conclude that the magistrate is not precluded altogether from assessing witness credibility.[15]

*811 Conclusion
In summary, I do not believe that it was an abuse of discretion on the part of the magistrate to have determined that defendant's conduct did not rise to the level of gross negligence required to bind him over on a charge of involuntary manslaughter. Nor do I believe that it was an abuse of discretion on her part to have made judgments about the respective testimonies of the expert witnesses.
The continued prosecution of this defendant is, in my judgment, without a sound legal basis and constitutes a manifest injustice, one that will only become more apparent as Finley's colleagues (who have reached a civil settlement with defendant's employer, Finley v. May Dept. Stores, Docket No. 122493, 653 N.W.2d 406) are called upon by the prosecutor to testify about defendant's course of criminal conduct. I would peremptorily reverse the judgment of the Court of Appeals and reinstate the decision of the magistrate.
MICHAEL F. CAVANAGH, J., concurs in the statement of MARKMAN, J.
NOTES
[1] Unpublished order, entered March 12, 2001 (Docket No. 232680).
[2] 464 Mich. 852, 627 N.W.2d 601 (2001).
[3] Unpublished opinion per curiam, issued September 25, 2001 (Docket No. 234208, 2001 WL 1134723).
[1] Accompanying defendant at the store were fellow security personnel, Burt Nowlin and Roderick Alexander, and two investigators in Lord & Taylor's loss prevention department, Linnea Booth and Mary Graney.
[2] The group included Mr. Finley, two adult women, Miss Carla Finley, also known as Carla Sullivan, and Miss Lanetta Gordon, and one eleven-year old girl, Miss Tiara Walker.
[3] Tania Ellis, a security person employed by the Fairlane Town Center Mall who arrived on the scene at a point when defendant was still on top of Finley, and while Finley was continuing to struggle, testified that after defendant got off Finley, Finley had a "strong heartbeat" and was "breathing fine." It was not until approximately four minutes later, after emergency medical services personnel had arrived, that Finley actually stopped breathing.
[4] According to a security videotape in the parking lot, the struggle between defendant and Finley lasted less than two minutes.
[5] The magistrate set forth the elements of involuntary manslaughter as follows:

First, that the defendant caused the death of the deceased, that is, that the deceased died as a result of the defendant's actions.
Second, in doing the act that causes the decedent's death, the defendant acted in a grossly negligent manner.
Third, that the defendant caused the death without lawful excuse or justification.
[6] Dr. Pietak admitted that it would not be "appropriate medical practice" to issue an autopsy report before toxicology findings had been completed, but he nevertheless claimed to have reached a conclusion in this regard on June 25, 2000, five days before the toxicology findings became available. Furthermore, there was nothing in his files that documented the fact that his conclusion was reached on June 25.
[7] Dragovic testified that Finley possessed an enlarged heart, enlarged lungs, and an enlarged liver, all of which were classic symptoms of heart failure. This, according to the magistrate, was overlooked in Pietak's observations about the cause of Finley's death.
[8] Unpublished opinion per curiam (on remand), issued September 25, 2001 (Docket No. 234208, 2001 WL 1134723).
[9] The claim of manslaughter in this case, premised upon allegations that defendant committed "gross negligence," must also be considered in light of the fact that defendant, a security guard, was in the process of committing a lawful act in confronting suspected shoplifters. See Weatherholt v. Meijer Inc., 922 F.Supp. 1227, 1231 (E.D.Mich., 1996), noting that M.C.L. § 600.2917 provides a partial statutory privilege to merchants who detain or confront individuals who unlawfully remove property from their store.
[10] Not only is there a lack of testimony that defendant was seen choking or strangling the victim, but it is noteworthy that no member of the Finley group was called to testify by the prosecutor, much less to testify to the contrary. The Court of Appeals relies upon evidence in the record that "after defendant released his hold on Finley, defendant was `very angry,' and when he and another security guard attempted to pick Finley up off the ground, but were unsuccessful, defendant `threw' Finley back onto the ground." Slip op. at 5-6 n. 1. The Court cites this as "additional evidence that defendant may have possessed a state of mind that amounted to an indifference to Finley's rights." Id. Concerning defendant's anger, I find that a display of anger in a situation in which one, and one's colleagues, have been physically attacked and threatened with death, constitutes dubious evidence of "gross negligence." Concerning defendant's throwing Finley to the ground, there was multiple eyewitness testimony asserting that Finley continued to struggle almost until this moment.
[11] The witnesses testified to this assertion, even though one also noted that defendant had his arms "wrapped around [Finley's] head and neck area." Further, the witness who testified that the guards were a "little bit rougher than they needed to be," was referring to the manner in which the guards, including defendant, attempted to roll Finley over after defendant had gotten off him.
[12] If defendant did not apply sufficient pressure to Finley's neck to cause visible external injuries, as indicated by Dr. Gadzinski and as verified by Dr. Pietak, then with what degree of certainty can Finley's internal hemorrhaging be attributed to external force being applied upon his neck, as Dr. Pietak did? This query is especially relevant in light of the alternative reasons presented by Dr. Dragovic and Dr. Gadzinski for the internal hemorrhaging.
[13] Although, to my knowledge, neither expert claims that bruises or abrasions indicative of asphyxia were externally present or noticeable on Finley's head or neck area.
[14] The Court of Appeals stated that the magistrate" failed to take into consideration" testimony that she "found" lacking in credibility. Slip op. at 5. However, this observation is belied by the magistrate's own opinion wherein she acknowledged the testimony of the "two well trained and qualified physicians" and concluded, on the basis of both of their testimony, that one expert's conclusion was, in her judgment, based on many factors and more reliable than the other.
[15] Additionally, M.C.L. § 766.13 supplies a number of textual clues about the magistrate's role at the preliminary examination. The statute, for example, directs the magistrate to make a "probable cause" determination on the basis of how the evidence "appear[s] to the magistrate" at the "conclusion" of the preliminary examination. The "probable cause" determination contemplates, I believe, an inquiry into all relevant facts, after which a neutral judicial officer is to exercise some judgment in according legal meaning to such facts. See People v. Dellabonda, 265 Mich. 486, 491, 251 N.W. 594 (1933). The "appear[s] to the magistrate" language also suggests that the magistrate is to exercise some judgment in analyzing the evidence at the preliminary examination, rather than engaging in the mere mechanical exercise of toting up whether the prosecutor has presented any evidence on the elements of the offense. As this Court stated in Yaner, supra at 289:

The clear, evident intent of this statute was, that the magistrate should exercise his best judgment in the matter; that he should from the testimony determine whether the crime charged in the warrant had been committed....
Finally, the reference to the magistrate's decision being rendered at the "conclusion" of the matter seems to require that the magistrate must consider the totality of the evidence presented, and that the magistrate must do so even if evidence introduced at the outset of the preliminary examination appears to satisfy the elements of a criminal offense. In Evans, supra at 387, 40 N.W. 473, addressing the similar preliminary examination statute then in effect, this Court explained:
The statute requires the justice, after "an examination of the whole matter," to come to an opinion as to whether or not an offense has been committed; and, if of opinion that there has been, then as to whether there is probable cause to believe the accused guilty thereof, and thereupon to discharge or hold him to answer according to the conclusion reached....