*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

UNPUBLISHED
April 25, 2024

v

No. 367311
Ingham Circuit Court
LC No. 22-000785-FH

DEANTHONY THOMAS-SCOTT VANATTEN,

        Defendant-Appellee.

Before: GADOLA, C.J., and BORRELLO and PATEL, JJ.

PER CURIAM.

In this interlocutory appeal, the prosecution appeals by leave granted[1] the trial court's order granting defendant's motion to suppress evidence of a firearm. Defendant is currently charged with eight counts, carrying a concealed weapon, MCL 750.227, receiving and concealing a stolen firearm, MCL 750.535b, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, four counts of resisting or obstructing a police officer, MCL 750.81d(1), and one count of retail fraud, MCL 750.356d(4), following his arrest at a Meijer store in East Lansing. The arrest arose out of a 9-1-1 call in which the caller reported defendant walking into the store, with a mask over his face, while armed with a handgun. The trial court suppressed evidence of the handgun. On appeal, the prosecution correctly asserts that the trial court erred when it concluded that the firearm was obtained in violation of defendant's Fourth Amendment guarantee against unreasonable searches and seizures. For the reasons set forth in this opinion, we vacate the trial court's suppression of the weapon and remand to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND[2]

---

[1] *People v Vanatten*, unpublished order of the Court of Appeals, entered November 13, 2023 (Docket No. 367311).

[2] Because the trial court did not hold an evidentiary hearing on the motion to suppress, the background facts as set forth in this opinion are taken from the preliminary examination transcript.

The incident which gives rise to this appeal occurred on April 25, 2022, when Taylor Devlin, an Ingham County 9-1-1–dispatcher, received a 9-1-1 call from a woman at a Meijer store on Lake Lansing Road. The woman—who gave her name and contact number to the dispatcher—reported seeing a man, later identified as defendant, wearing a mask that covered his entire face except for his eyes. She reported that defendant started going into the store, then walked back to his car to get a gun. The caller further told 9-1-1 that after obtaining a gun from his car, defendant then "ran" into the store. The caller reported that the man had a yellow and black jacket, along with a mask that covered his entire face, except for his eyes. The caller also gave a description of the man's approximate age and race, as well as the entrance of the store that he used. In addition, the caller described the man's automobile as well as the woman who remained in the car. At the request of officers, the caller later returned to the store and spoke with East Lansing Police Officer Jose Viera.

East Lansing Police Officer Austin Nelson, along with three other officers, responded to the call. Officer Nelson described the call as a "weapons complaint that came out through a felony tone" According to Officer Nelson, the "felony tone" was a radio tone that signaled a "major incident" that involved a weapon. He, along with the other responding officers were relayed information about the 9-1-1 call, including the description of the suspect, the store entrance used by the suspect, and the fact that he was armed. The officers did not know the name of the 9-1-1 caller, though she had given her name.

Upon entering the store, Officer Nelson, along with Officer Jeffrey Horn "immediately" saw defendant. The officers testified that they wanted to talk with defendant; however, defendant walked away after Officer Nelson made eye contact with him and before the officer said anything to him. Shortly thereafter, defendant began sprinting towards the exit on the other side of the store. According to Officer Horn, the officers wanted to speak with defendant because they were concerned about his act of going back to his car to get a firearm, and then immediately running into the store with the firearm, while wearing a facemask.

Officer Nelson testified at the preliminary examination that defendant's flight, combined with his evasiveness, made him believe that criminal activity was afoot. Officer Nelson and Officer Horn began a foot pursuit through the store. They relayed their pursuit, as well as defendant's path, to other officers on the other side of the store. Officer Viera commanded defendant to stop and to put his hands up, but defendant continued fleeing, while raising one of his arms in the air. It appears that one of the officers had drawn his firearm at this time.

Officer James Menser, who had been looking for defendant's vehicle in the parking lot, saw defendant running outside the store. Officer Menser ordered defendant to get down on the ground, but defendant did not comply; instead, defendant continued to run. Officer Menser drew his taser and, while giving defendant commands to stop, began chasing defendant. During the chase, defendant took out his handgun and ran with the weapon in his hand. At that time, he was looking back at Officer Menser. In response, Officer Menser dropped his taser, drew his firearm, and took cover behind a nearby pickup truck.

Defendant hid behind a car in the parking lot after drawing his firearm. Officer Menser testified that he was afraid defendant was going to begin shooting, so he fired two shots at defendant. Defendant fell to the ground after being hit by at least one of the shots. Defendant got

back up and started moving on foot. Officers eventually apprehended defendant. At some point after he was shot, defendant dropped his gun. Officers later found the gun and matched a fingerprint on the weapon to defendant's fingerprint on his left ring finger.

Before trial, defendant filed a motion to suppress the handgun. He argued that he was seized when the officers began running after him. He argued that the officers lacked probable cause at the time they seized him. He argued that the 9-1-1 call was an unreliable, anonymous tip.

In response, the prosecutor argued that the law enforcement officers had reasonable suspicion to perform an investigative stop. The prosecution argued that the 9-1-1 call was not an anonymous tip, given that the caller had left her name and telephone number with the dispatcher.

At the hearing on the motion to suppress, the trial court focused on what it characterized as a lack of reliability on the part of the 9-1-1 caller. The court characterized the caller as an "anonymous" tipster and expressed concerns about the officers' ability to form a reasonable, articulable suspicion based on information given by an anonymous tipster. The court noted that the officers did not have "anything other than the description" of defendant from the caller, and while the trial court noted that the description was correct, the court continued to express concerns about the tipster's identity and the lack of any information about the tipster's credibility. According to the trial court, the officers lacked reasonable suspicion from the 9-1-1 call.

The court did not expressly state when defendant was "seized" for purposes of the Fourth Amendment. However, the court stated that it was "not enough" for officers to have "heightened suspicion" when defendant initially ran from them. The court stated it "becomes enough" out in the parking lot, but that was "too late." The court continued, stating:

> I am granting the motion. I think this is a close call, but it's also indicative of racial profiling. We didn't follow the case law as I read it. I understand it. You can tell me that I'm just uninformed and don't get it, but when I break this situation down, I don't believe that the law was followed as it should be, keeping with everybody's rights and the police officers' obligation to do more of a check.
>
> This was not an emergent situation. No one saw a gun. He was simply a young Black man with a face mask in a Meijer's buying something, going to his vehicle. He didn't cause any problem, and there's no reason to believe that he was going to commit a crime or that he even had a gun.
>
> Some more foundational work should have been done, even something tiny, other than him running away from police and them - - they themselves causing the reasonable suspicion to elevate. I don't find that's enough. I think this is a scary time and it's a scary situation. I don't like guns, but I also don't like elevating reasonable suspicion when there was none or very little.

The court entered a written order that granted the motion for the reasons stated on the record.

## II. ANALYSIS

On appeal, the prosecution asserts that the trial court erred when it granted defendant's motion to suppress the handgun because there was no illegal seizure. They further argue that although defendant was ultimately seized when police fired at and physically contacted defendant, this seizure was permissible because police had more than a reasonable suspicion to believe that defendant was engaged in criminal activity: police were responding to a potential crime with a suspect who matched defendant's description and he immediately fled when he saw police. Further, when officers told defendant to stop, he pulled out a gun.

Defendant asserts that at the moment police began chasing defendant, he was seized within the Fourth Amendment and at that time, police did not have the requisite level of suspicion to lawfully seize defendant. Additionally, defendant argues, the prosecution did not present any counterarguments to this and instead argued that police had sufficient reason to seize defendant at that point. Defendant argues that the prosecution's challenge on appeal regarding the moment of seizure, therefore, is waived. Regardless, defendant urges that the trial court correctly determined that seizure occurred when officers began pursuing defendant, consistent with *People v Shabaz*, 424 Mich 42, 59; 378 NW2d 451 (1985).

We begin our analysis by taking up defendant's assertion that the prosecution's argument relative to the moment when defendant was seized was waived. [3]"To preserve an issue, a party must raise it before the trial court." *People v Swenor*, 336 Mich App 550, 562; 971 NW2d 33 (2021). "A challenge on one ground before the trial court is not sufficient to preserve a challenge on another ground on appeal." *Id*. When a party raises a separate argument on appeal from the arguments the party raised before the trial court, the party must satisfy the standard for plain-error review. *Id*.

The prosecution asserts two related arguments on appeal: (1) that defendant was not seized for Fourth Amendment purposes until police shot him in the parking lot, and (2) the police did have a reasonable and articulable suspicion that a crime was afoot to justify defendant's seizure.

We conclude that the prosecution failed to properly preserve this argument for appeal. In the trial court, the prosecution acknowledged that an investigatory stop took place and that the police had sufficient justification to question defendant inside the store. However, the

---

[3] In his brief on appeal, defendant uses the terms "waived" and "unpreserved" interchangeably. In *People v King*, 512 Mich 1, 9; 999 NW2d 670 (2023) (quotation marks and citations omitted), our Supreme Court explained the difference between forfeiture and waiver:

> Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right. A waiver extinguishes the right, as well as any right to pursue an alleged error on appeal. On the other hand, when a litigant fails to timely assert a right or object to an alleged error, it is deemed to be forfeited, but the error is not extinguished.

The prosecution has not waived its argument regarding when seizure occurred, because, although the prosecution never contested the timing of seizure, the prosecution also never expressly adopted defendant's viewpoint with respect to when seizure occurred. Therefore, there was no instance where the prosecution intentionally relinquished or abandoned a known right. See *id*.

prosecution's stance in the lower court regarding *when* defendant was seized remains unclear. The prosecution cites *Johnson v VanderKooi*, 509 Mich 524, 537 n 5; 983 NW2d 779 (2022), for the proposition that the prosecutor's underlying constitutional argument—that there was no illegal seizure of defendant—was preserved, so on appeal, it may raise any argument in support of this claim. Although the prosecution's claim that seizure was justified and its claim that seizure did not occur until defendant was shot are related, they remain two separate arguments.

This Court reviews the trial court's findings of fact at a hearing on a motion to suppress for clear error. *People v Clark*, 330 Mich App 392, 414; 948 NW2d 604 (2019). A finding is clearly erroneous if it leaves the appellate court with a definite and firm conviction that a mistake was made. *Id*. This Court reviews de novo whether the trial court properly applied constitutional standards or properly applied the law to the motion to suppress. See *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014). "This Court reverses it only where there has been an abuse of discretion." *Clark*, 330 Mich App at 415 (quotation marks and citation omitted). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Id*. "This Court reviews unpreserved constitutional issues for plain error affecting a party's substantial rights." *Swenor*, 336 Mich App at 564. "An error is plain if it is clear or obvious, and it affects substantial rights if it affected the outcome of the lower court proceedings." *Id*. An error is also plain when it is contrary to well-settled law. *Id*.

Both the United States and Michigan Constitutions guarantee the right to be secure from unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. Our Supreme Court "has ruled that the Michigan Constitution 'is to be construed to provide the same protection as that secured by the Fourth Amendment, absent compelling reason to impose a different interpretation.' " *People v Slaughter*, 489 Mich 302, 311; 803 NW2d 171 (2011) (quotation marks and citation omitted). Under certain circumstances, a police officer may approach and temporarily detain a person for the purpose of investigating possible criminal behavior even though there is no probable cause to support an arrest. *Terry v Ohio*, 392 US 1, 22; 88 S Ct 1868; 20 L Ed 2d 889 (1968). A brief detention does not violate the Fourth Amendment if the officer has a reasonably articulable suspicion that criminal activity is afoot. *People v Oliver*, 464 Mich 184, 192; 627 NW2d 297 (2001); *Terry*, *supra* at 30-31. Whether an officer has a reasonable suspicion to make such an investigatory stop is determined case by case, on the basis of an analysis of the totality of the facts and circumstances. *Oliver*, *supra* at 192. A determination regarding whether a reasonable suspicion exists "'must be based on commonsense judgments and inferences about human behavior.'" *Id*. at 197 (citation omitted). *People v Jenkins*, 472 Mich 26, 32; 691 NW2d 759 (2005).

"A seizure within the meaning of the Fourth Amendment occurs only if, in view of all the circumstances, a reasonable person would have believed that he was not free to leave." *Id.* "A defendant is generally not 'seized' until a police officer 'physically hinder[s] defendant's departure and instruct[s] him to stay in the officer's presence.' " *Jenkins*, 472 Mich at 34. For instance, "when there is no show of force and an officer approaches an individual in a public place and asks for voluntary cooperation through noncoercive questioning, there will generally be no seizure." *People v Lucynski*, 509 Mich 618, 636; 983 NW2d 827 (2022) (quotation marks and citation omitted). Additionally, an expression of authority to which the subject does not yield is not a seizure. See *California v Hodari D*, 499 US 621, 624-626; 111 S Ct 1547; 113 L Ed 2d 690 (1991). A seizure requires application of physical force or submission to the assertion of authority. *Id*.

-5-

However, if an officer applies "physical force to the body of a person with intent to restrain" there "is a seizure even if the person does not submit and is not subdued." *Torres v Madrid*, 592 US 306, 325; 141 S Ct 989; 209 L Ed 2d 190 (2021) (holding that "the officers seized Torres by shooting her with intent to restrain her movement").

We begin our analysis of the matter by an examination of all of the circumstances surrounding the encounter, to determine at what time defendant could have reasonably believed that he was not free to leave. "The test provides that the police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Michigan v Chestnut*, 486 US 567, 573; 108 S Ct 1975; 100 L Ed2d 565 (1988). (internal citations omitted).

We are somewhat hindered in our efforts to ascertain when a seizure took place by the trial court's failure to make a definitive finding as to when defendant was seized. Our review of the record reveals that some of the trial court's comments suggest that it believed defendant was seized while inside the Meijer store when he began running, and defendant has interpreted the trial court's comments in that way. However, the trial court never expressly stated the same. Failure by the trial court to make this crucial finding led to a string of clearly erroneous, and confusing rulings. For example, the trial court stated, in what appears to be contradictory fashion, that the officers "could have followed" defendant when he was in Meijer, but then faulted the officers for following defendant when he ran inside the store. The trial court found that the "tipster's" description of defendant and where he could be found in the store were accurate but then found that there was "*no reason* to believe…[defendant] even had a gun."

The parties agree that it is necessary to ascertain when defendant was seized because it is at the moment of seizure that the police must have the requisite level of proof---a reasonably articulable suspicion that criminal activity is afoot---to justify the seizure of defendant.[4]

The United States Supreme Court has explained that no seizure occurs if a law enforcement officer gives a command, but the suspect does not comply. *California v Hodari D*, 499 US 621, 626; 111 S Ct 1547; 113 L Ed 2d 690 (1991). If, as is the case here, a suspect flees from officers and does not submit to commands to stop, the suspect has not been seized, even if the police officers chase the suspect. *Id*. See also *People v Lewis*, 199 Mich App 556, 559; 502 NW2d 363 (1993). Instead, "to constitute a seizure for purposes of the Fourth Amendment there must be either the application of physical force or the submission by the suspect to an officer's show of authority." *Lewis*, 199 Mich App at 559.

Defendant argues that he was seized as soon as he ran from the officers inside Meijer. He argues that a Michigan case that pre-dates *Hodari D—People v Shabaz*, supports his position by standing for the proposition that a defendant is "seized" by officers when they pursued him after he attempted to "go on his way." In *Shabaz*, a plainclothes police officer in an unmarked vehicle observed the defendant leaving an apartment building carrying a small brown paper bag. *Id*. at 47. The defendant looked in the officer's direction and began to stuff the paper bag under his clothes. *Id*. The unmarked vehicle slowed as the defendant passed and nearly came to a complete stop

---

[4] The parties agree that this case involves a *Terry* stop.

when the defendant began to run. *Id*. An officer got out of the car and chased the defendant. *Id*. Based on these factors, our Supreme Court concluded:

> Assessing collectively the individual factors with which the officers were confronted in dealing with the rapidly unfolding events on Clairmount Avenue, we are unable to conclude that they combined to create a totality of circumstances having any different constitutional quality or significance than did the constituent parts.

> Each factor is capable of innocent interpretation, and we find the individual factors here do not build to form the requisite objective basis for the particularized suspicion required to justify a *Terry* stop. The police were not investigating a recently committed crime in the area which may have been linked to the defendant, nor was he known to the officers as a suspect in a crime. There was no contraband visible on defendant's person; the officers could only guess at the contents of the paper bag. The defendant's flight from plain-clothes pursuers in an unmarked car was at most ambiguous, and at least understandable.

> We conclude that the circumstances, as they appeared to the police officers on the night in question, considered in their totality, did not provide the requisite particularized suspicion based on objective observation that criminal activity was afoot sufficient to outweigh the defendant's privacy interests under the Fourth Amendment. *Shabaz*, 424 Mich at 64-65.

On appeal, defendant asserts that *Shabaz* stands for the bright-line proposition that: "[a]s soon as the officers began their pursuit, defendant's freedom was restricted" and thus he was not "free to leave." We do not concur with defendant's assertion that our Supreme Court established a bright-line test---that once police officers take chase a defendant is *automatically* determined to be seized within the context of the Fourth Amendment. In fact, our Supreme Court in a subsequent case, *People v Mamon*, 435 Mich 1, 10-12; 457 NW2d 623 (1990), reported favorably that the United States Supreme Court rejected such a bright-line test in *Chestnut*, 486 US at 573:

> In a recent case almost identical to the one before this Court today, the United States Supreme Court refused to adopt a brightline rule to determine when a police chase constituted a seizure. Rather, the Court reaffirmed its adherence to a "traditional contextual approach."

Still, defendant asserts that *Shabaz* controls the outcome of this case. While *Shabaz* is certainly applicable, it is not controlling. Contrary to the facts presented here, in *Shabaz*, the "police were not investigating a recently committed crime in the area which may have been linked to the defendant, nor was he known to the officers as a suspect in a crime. There was no contraband visible on defendant's person; the officers could only guess at the contents of the paper bag. The defendant's flight from plain-clothes pursuers in an unmarked car was at most ambiguous, and at least understandable." *Id*. Here, the facts are quite different. Police received a tip that a man had entered a Meijer store wearing a mask that covered most of his face and while carrying a gun. Upon their arrival at the store, police saw defendant, who matched the description given by the 9-1-1- caller, in a place in the store where the 9-1-1 caller said he could be found. As police

approached to question defendant, he ran from them. Police then gave chase and defendant refused to stop and continued to run away from police. Unlike the officers in *Shabaz*, here, the police were in full uniform and driving marked patrol vehicles. Contrary to the facts presented in *Shabaz*, here, police were investigating the possibility that defendant was concealing his face and carrying a weapon for criminal purposes. These factual differences cause us to conclude that while Shabaz is applicable, it is not controlling.

The factual differences presented in *Shabaz* and this matter cause us to conclude that *Shabaz* is not controlling. Rather, we find our Supreme Court's decision in *Mamon* controlling. In *Mamon*, our Supreme Court appeared to refine and narrow *Shabaz* in a lead opinion issued by Chief Justice Riley, 435 Mich at 11. The *Mamon* decision, issued in 1990, also predates *Hodari D*. The three-justice lead opinion authored by former Chief Justice Riley held that a police foot chase was not automatically a seizure. *Id*. at 11-14. Justice Brickley's concurring opinion concluded that the defendant, whose flight began before he was even being pursued—similar to defendant in the instant case—was not "seized" under the circumstances. *Mamon*, 435 Mich at 19-20 (BRICKLEY, J.). He also distinguished the case from *Shabaz*. *Id*. at 18-21. Accordingly, there were four votes in *Mamon* for concluding that a defendant who fled from officers under the circumstances of that case did not amount to a seizure. A similar scenario occurred in the instant case, given that defendant ran as soon as officers looked at him, and given that the entire chase was a foot chase. The facts presented here are consistent with those presented in *Mamon* rather than *Shabaz* and accordingly, we conclude *Mamon* is controlling.

We additionally note that the trial court, in granting the motion, relied exclusively on the United States Supreme Court's decision in *Florida v JL*, 529 US 266; 120 S Ct 1375; 146 L Ed 2d 254 (2000). In that case, an anonymous caller reported to Miami-Dade Police that a young Black male standing at a bus stop wearing a plaid shirt was carrying a gun. *Id*. at 268. The Supreme Court held that such a tip, without more, was not enough to give rise to reasonable suspicion to justify an officer's stop and frisk of that person. *Id*.

Initially, it does not appear that the caller in this case was anonymous.[5] Rather, the caller left her name and telephone number, and she agreed to meet with officers on the scene, despite an initial reluctance to do so. Further, the caller in this case gave information about how she knew defendant had a gun—she told the dispatcher that she saw defendant take the gun from his car. And, more importantly, it appears that the trial court erred in this case by either failing to determine when defendant was seized or perhaps suggesting, as defendant argues on appeal, that defendant was seized as soon as he ran from the officers. Here, the trial court discussed *JL* and the tipster in connection with its conclusion that the officers lacked reasonable suspicion when defendant started running.

---

[5] Defendant urges that because the caller's identity was not known to all the officers on scene, this made the tip "anonymous" and inherently unreliable. But whether the caller's identity is known to the officers on scene is not decisive. It is the fact the caller, or any other tipster, is willing to leave a name and/or phone number that makes the tip more reliable than a truly anonymous tip might be. Because the caller in this case left her identifying information with the dispatcher the tip is deemed to have greater reliability.

Examination of the record leads us to conclude that a seizure occurred when Officer Menser shot defendant. See *Torres v Madrid*, 592 US at 325. ("We therefore conclude that the officers seized Torres for the instant that the bullets struck her."). [Such a seizure was only momentary, however, given that defendant started running again after he was shot.] By that time, police officers were confronted with the following facts. First, a patron of the Meijer store saw defendant grab a gun and, while wearing a full-face mask, run into the store. Second, the officers saw a person matching the description given by the 9-1-1 caller, in the area where the caller said the person could be found. Third, at the sight of the uniformed officers, defendant ran away before the officers could even speak with him. Such flight can corroborate the notion that defendant was engaged in criminal activity. See *Illinois v Wardlow*, 528 US 119, 124; 120 S Ct 673; 145 L Ed 2d 570 (2000) (noting that unprovoked flight upon seeing police, and other "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). Defendant's flight also helped corroborate the information given by the 9-1-1 caller, which can help establish the reliability of the caller and lead to a reasonable, articulable suspicion. *People v Pagano*, 507 Mich 26, 33; 967 NW2d 590 (2021). Fourth, defendant continued running outside the store, and he ignored commands to stop. Fifth, while he was being pursued by Officer Menser, defendant produced a handgun, looked back at Officer Menser, and appeared to take cover in a way that led Officer Menser to believe that defendant might begin shooting at him. Under these facts, there was reasonable suspicion for Officer Menser to believe that criminal activity was afoot at the time he shot defendant. And such a reasonable suspicion continued to exist after defendant resumed his flight after shots were fired. See *Torres*, 592 US at 325.

The trial court findings to the contrary were confusing and contained misstatements of law and fact and a failure to follow well-settled law. Accordingly, the trial court abused its discretion when it ordered the gun suppressed.

Vacated and remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Sima G. Patel